IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOSEPH CAMPBELL,

               Plaintiff,

    v.

ROYAL BANK SUPPLEMENTAL
EXECUTIVE RETIREMENT PLAN,

            Defendant.

CIVIL ACTION
NO. 19-798

**Slomsky, J.**                                                                **September 2, 2022**

## <u>OPINION</u>

**I.  INTRODUCTION**………………………………………………………………….…1

**II. FINDINGS OF FACT**………………………………………………………………….3

    A.  Factual Background……………………………………...………………………..3

        1.  The SERP……………………………………………………..…………….…3

            a.  SERP Definitions…………………………………………………....…3

            b.  Termination of Employment Upon Change of Control……………….....4

            c.  Plan Administration…………………………………………………....5

        2.  The Rabbi Trust………………………………………………………….8

        3.  Campbell's Participation in the SERP…………….………………………10

        4.  The Decision to Use the Citi Rate rather than the 5-Year United States
            Treasury Note rate……………………….…………..…………………11

        5.  The Merger Closes and the SERP is Terminated………………………16

        6.  Campbell Receives a Lump Sum Distribution…………………………16

    7.  Campbell submits a claim for an additional SERP Benefit to the BMT Board…………………………………………………………….…...17

    8.  Campbell Appeals the Denial of his Claim for an additional SERP Benefit …………………………………………………….……..……..21

  B.  Procedural History……………………………………………………………23

**III. CONCLUSIONS OF LAW**……………………………………………………………24

  A.  Top hat plans under ERISA and the Rabbi Trust…………………………………24

  B.  <u>Firestone Tire & Rubber Co.</u> and <u>Goldstein</u> Decisions………………………….26

  C.  BMT Board's Interpretation of the SERP is subject to de novo review………….....27

    1.  Sections 9.1 and 9.3………………………………………………………28

    2.  Section 11.6………………………………………………………………33

  D.  The BMT Board did not properly interpret the SERP when it applied the Citi Rate in calculating Campbell's lump sum payment rather than using the 5-Year United States Treasury Note Rate…………………………….34

    1.  Legal Standard…………………………………………………...…....34

    2.  Section 6.2 of the SERP is not susceptible to two different interpretations……………………………………………………………37

    3.  The phrase "subject to the above terms" in Section 9.7 of the SERP is ambiguous………………………………………………….41

        a.  Defendant's application in Section 9.7 of the SERP of "Actuarial Equivalence" in Section 2.2 is misplaced because Section 9.7 does not require "Actuarial Equivalence"………43

        b.  BMT Board's interpretation of Section 9.7 rendered the phrase "subject to the above terms" superfluous………………..44

        c.  BMT Board's interpretation of the SERP rendered Section 6.2 meaningless……………………………………………45

        d.  Royal Bank's prior use of the actuarial equivalent discount rate does not overcome the plain language of the SERP……………………………………………………47

    E.  The BMT Board abused its discretion when it selected the Citi Rate
        to calculate Campbell's lump sum distribution……………………………………..49

        1.  The BMT Board's interpretation of the SERP was not
            consistent with goals of the SERP……………………………………………50

        2.  The BMT Board rendered SERP language meaningless
            and internally inconsistent…………………………………………………....50

        3.  The BMT Board's interpretation of the SERP does not
            appear to conflict with the substantive requirements of ERISA,
            but it may conflict with the procedural requirements……………………....50

        4.  The BMT Board may not have interpreted the SERP
            consistently……………………………………………………………...…51

        5.  The BMT Board's interpretation is contrary to the
            clear language of the SERP……………………………………………....51

        6.  Evidence of BMT's Bad Faith…………………………………………..53

**IV. CONCLUSION** …………………………………………………………..…..56

## I.  INTRODUCTION

Plaintiff Joseph Campbell ("Plaintiff" or "Campbell") is the former President and Chief Executive Officer of Royal Bank America ("Royal Bank") and Royal Bancshares of Pennsylvania, Inc.  (Doc. No. 63 at 2.)  (Doc. No. 64 at 7.)  Campbell was a participant in the Royal Bank Supplemental Executive Retirement Plan ("the SERP" or "Defendant").  (See Doc. No. 63 at 2.) (See Doc. No. 64 at 7.)  (See also Doc. No. 50 at 9.)  The SERP is a "top hat" retirement plan that is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. ("ERISA").[1]  (Doc. No. 63 at 2.)  (Doc. No. 50 at 9.)

On December 15, 2017, the Bryn Mawr Trust Company ("Bryn Mawr Trust" or "BMT") acquired Royal Bank and, at the direction of BMT's Board of Directors ("BMT Board"), terminated the SERP.  (Doc. No. 63 at 2.)  When the SERP was terminated, Campbell received a lump sum payment of $3,924,910.  (See id.)  (See also Doc. No. 50 at 10.)  The payment was calculated using an actuarial equivalent discount rate, which at the time was the Citi Rate.[2]  (Doc. No. 63 at 2.)  The term "actuarial equivalent" is referred to in Section 2.2 of the SERP.  (Id.)  After receiving his distribution, Campbell filed a claim with Bryn Mawr Trust, noting that his lump sum

---

[1]  A "top hat" plan is "a defined benefit pension plan that does not require a limit on the amount of compensation that may be recognized."  Zebrowski v. Evonik Degussa Corp. Admin. Committee, 578 Fed.Appx. 89, 90-91 (3d Cir. 2014).  As the Third Circuit Court of Appeals explained in Zebrowski:

> Top hat plans allow executives with salaries above the compensation limit to ensure retirement income that is close to their pre-retirement income.  They permit an employee to defer some compensation until retirement, when the employee may be in a lower tax bracket.

Id. at 90-91 n.2.

[2]  The Citi Pension Liability Index ("the Citi Rate") is derived from Citi Bank's Pension Discount Curve ("CPDC").  (Ex. 7.)  The CPDC is calculated based on a universe of AA rated corporate bonds from Citi's US Broad Investment Grade Bond Index (USBIG) and the yields of Citi's Treasury Bond model curve.

payment should have been calculated using the 5-Year United States Treasury Note rate, as set forth in Section 6.2 of the SERP.  (Doc. No. 64 at 24.)  This would have resulted in Campbell receiving a larger lump sum payout.  (Doc. No. 64 at 24.)  BMT denied his claim.  (Id. at 27.)

Thereafter, Campbell filed suit under § 502 (a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), to recover the difference between what he was paid and the higher lump sum payment he believed he was entitled to receive, challenging BMT Board's interpretation of the SERP.  (Doc. No. 63 at 2.)  Hence, the gravamen of the dispute here is what discount rate should have been used to calculate Campbell's lump sum payment.  Plaintiff submits the 5-Year United States Treasury Note rate should have been used, while Defendant contends that the actuarial equivalent discount rate, the Citi Rate, applied.

A bench trial was held on October 26 and 27, 2021.  The following witnesses testified: 1) Plaintiff Campbell,  2) Michael Bruschini, a SERP financial advisor,  3) Richard Pearson, another SERP financial advisor,  4) Michael Thompson, the former Chief Financial Officer ("CFO") of Royal Bank,  5) Keith McCutcheon, the BMT Treasurer, and 6) John May, a transactional lawyer for 40 years, currently at a large law firm in Philadelphia and one of the BMT Board Members who denied Campbell's claim.  (Doc. No. 63 at 2.)  On January 13, 2022, both parties filed Proposed Findings of Fact and Conclusions of Law.  (Doc. Nos. 63, 64.)  Closing arguments were heard by the Court on January 21, 2022.  (Doc. No. 66.)  For reasons that follow, judgment will be entered in favor of Plaintiff and against Defendant.

II.     **FINDINGS OF FACT**

    **A. Factual Background**

       **1.  The SERP**

On January 1, 1998, Royal Bank established the SERP to provide supplemental retirement benefits to a small group of Royal Bank executives.[3]  (Doc. No. 63 at 2 ¶ 1.)  (Doc. No. 64 at 2.) The SERP was amended and restated on January 1, 2005.[4]  (Doc. No. 63 at 2 ¶ 2.)  (Doc. No. 64 at 2.)  The operative SERP relied upon by the Parties here is the amended 2005 SERP.  (See Ex. 1 at D3.)

As the SERP's Plan Sponsor, Royal Bank was responsible for creating and establishing the terms of the SERP.  (Doc. No. 64 at 2.)  Royal Bank's Board of Directors administered the SERP.[5] (Id.)  (Doc. No. 50 at 10.)   The relevant portions of the SERP are excerpted below, but when reading them bear in mind that the SERP is "a poorly drafted plan."  This was confirmed by the testimony of John May, Esquire, a BMT Board Member and, as noted, a lawyer practicing for more than 40 years.  (See Trial Transcript Day 2 27:2-6):

       **a.  SERP Definitions**

Section 2 of the SERP defines the SERP's terms.  Section 2.2 states:

    2.2. "Actuarial Equivalent" means, with respect to a given benefit, any other benefit provided under the terms of the Plan[6] which has the same present or equivalent value on the date the given benefit payment commences, based on the

---

[3]  The SERP had 25 participants.  (Doc. No. 63 at 2 ¶ 4.)

[4]  The amended SERP was presented to Royal Bank's Board of Directors by Greg Reardon, an independent director of Royal Bank, and by the Board of Director's Compensation Committee. (Doc. No. 64 at 3 ¶ 12.)

[5]  After the merger, the Board of Directors of Bryn Mawr Trust became the SERP's administrator.

[6]  All references to the "Plan" refer to the SERP.

use of actuarial equivalent factors adopted by the Bank and being used to value the Plan liabilities at the time of the calculation.

In this case, the parties agree that the actuarial equivalent discount rate is the Citi Rate.  (Doc. No. 63 at 17 ¶ 100.)  (Doc. No. 64 at 16 ¶ 89.)  Historically, Royal Bank used this discount rate to calculate and report on its annual financial statements the liability of the SERP.  (Doc. No. 63 at 14 ¶ 88.)

Section 2.6 defines a "Change of Control" as follows:

> 2.6.  "Change of Control" means the purchase or other acquisition by any person, entity or group of persons, within the meaning of Section l3(d) or 14(d) of the Securities Exchange Act of 1934 (hereinafter called "Act"), or any comparable successor provisions, of beneficial ownership (within the meaning of Rule 13e-3 promulgated under the Act) of thirty percent (30%) or more of either the outstanding shares of common stock or the combined voting power of the Bank's then outstanding voting securities entitled to vote generally, or the approval by the shareholders of the Bank of a reorganization, merger, or consolidation, in each case, with respect to which persons who were shareholders of the Bank immediately prior to such reorganization, merger or consolidation do not, immediately thereafter, own more than fifty percent (50%) of the combined voting power entitled to vote generally in the election of directors of the reorganized, merged or consolidated the Bank's then outstanding securities, or a liquidation or dissolution of the Bank or of the sale of all or substantially all of the Bank's assets.

The parties stipulate that the merger of Royal Bank with Bryn Mawr Trust constitutes a Change of Control as defined in this section of the SERP.  (See Doc. No. 63 at 4 ¶ 17.)

### b.  Termination of Employment Upon a Change of Control

Section 6.2 provides the procedure for what occurs if a participant's employment is terminated following a Change of Control.

> 6.2.  **Change of Control.** Notwithstanding anything to the contrary herein, if a Participant's employment with the Bank is terminated, other than by retirement, death, Disability, or Termination for Cause, within two (2) years of a Change of Control of the Bank, then, for purposes of this Plan, it shall be deemed that the Participant has remained in the employ of the Bank until the earlier to occur of: (a) the Participant's death; or (b) the Participant's attaining his or her Normal Retirement Age, except as provided in Section 4.2 herein. Furthermore, if at the

time a Change of Control occurs, the Bank had established a trust in accordance with Section 9.5 hereof, the Bank shall be required to transfer cash and/or other assets to said trust in an amount equal to the discounted present value of all of the future benefits payable hereunder to each Participant and Beneficiary. If the Bank had not previously established a trust in accordance with Section 9.5 hereof, a trust shall be established at the time a Change of Control occurs, and the above funding requirements will apply to said trust. The discount rate shall be the 5-Year United States Treasury Note rate as published on the first day of the month immediately preceding the date on which the determination is made, compounded annually. If these rates are no longer published, the discount rate shall be some other similar average selected by the Board in its sole discretion.

(See Ex. 1.)  As explained in further detail below, Campbell argues that this Section, and its mandatory use of the 5-Year United States Treasury Note rate, governs the calculation of his lump sum distribution.  (Doc. No. 64 at 10 ¶ 56.)

### c.  Plan Administration

The following sections relate to administration of the SERP.

9.1. **General.** The Plan shall be administered by the Board or its designee. The Board shall have the authority, subject to the terms of the Plan, to construe the provisions of the Plan and to adopt rules and regulations and make all determinations necessary or advisable for the administration of the Plan. The Board shall make all determinations as to rights to benefits under the Plan. No member of the Board shall be liable for any action of determination made in good faith with respect to the Plan or any SERP Agreement Any decision by the Board denying a claim by a Participant or a Beneficiary for benefits under the Plan shall be stated in writing and delivered or mailed to the Participant or Beneficiary at his or her last known address. Such decision shall set forth the specific reasons for the denial of benefits. In addition, the Board shall afford a reasonable opportunity to the Participant or Beneficiary for a full and fair review of the decision denying such claim within thirty (30) days of such notice.

…

9.3. **Interpretation.** The interpretation and construction of the Plan by the Board, and any action taken hereunder, shall be binding and conclusive upon all parties in interest. No member of the Board shall be liable to any person for any action taken or omitted to be taken in connection with the interpretation, construction or administration of the Plan, so long as such action or omission be made in good faith.

…

5

9.5.  **Authority to Establish a Trust.**  The Board shall have the right at anytime to establish a trust[7] to which the Bank may transfer from time to time certain assets to be used by said trustee(s) to satisfy some or all of the Bank's obligations and liabilities under the Plan.  All assets held by such trust shall be subject to the claims of the Bank's creditors in the event of the Bank's Insolvency (as defined herein).  The Bank shall be considered "Insolvent" for purposes of said trust if: (a) the Bank is unable to pay its debts as they become due; and (b) the Bank is subject to a pending proceeding as a debtor under the United States Bankruptcy Code.

9.7.  **Plan Terminations under Section 409A**.  Notwithstanding anything to the contrary in Section 9.6,[8] if the Bank terminates the Plan in the following circumstances:

---

[7]   This trust is known as a "Rabbi Trust."  (See Doc. No. 63 at 10.)  (See Doc. No. 64 at 5.)  As Plaintiff explained in his Proposed Findings of Fact and Conclusions of Law:

> "Rabbi trusts" are named as such because the first one to receive Internal Revenue Service approval was created by a congregation for its rabbi.  See IRS, Private Letter Ruling, PLR 8113107 (December 31, 1980); Rev. Proc. 92-64.  Although top hat plans like the SERP are required to be unfunded, an employer may set aside the plan's assets in a "Rabbi Trust" without jeopardizing the plan's unfunded status as long as the amounts held in such trust are subject to the claims of the employer's general creditors in the event of insolvency or bankruptcy.  See Accardi v. IT Litig. Trust (In re IT Group, Inc.), 448 F.3d 661, 665 (3d Cir. 2006).

(Doc. No. 64 at 5 n.4)

[8]   Section 9.6 provides:

> 9.6.  Amendment and Termination of the Plan.  The Bank reserves the right, at any time and from time to time, by action of the Board, to amend or terminate the Plan, including but not limited to the right to discontinue making premium contributions for any year for which the Bank is not profitable.  Notwithstanding the foregoing, no such amendment or termination shall reduce or accelerate (a) the benefits (including survivor benefits) of a Participant (or Beneficiary) to whom payments under this Plan had then commenced, or (b) the Accrued Benefit (including survivor benefits) of a Participant who has not yet attained his or her Normal Retirement Age, or (c) the benefits (including survivor benefits) of a Participant who has then attained his or her Normal Retirement Age, or (d) the benefits (including survivor benefits) of a Participant whose employment

6

(a) Within thirty (30) days before, or twelve (12) months after a Change in Control, provided that all distributions are made no later than twelve (12) months following such termination of the Plan and further provided that all the Company's plans and arrangements which are substantially similar to the Plan are terminated so the Participants and all participants in similar plans and arrangements are required to receive all amounts of compensation deferred under the terminated plans and arrangements within twelve (12) months of the termination of the plans and arrangements;

(b) Upon the Bank's dissolution or with the approval of a bankruptcy courts provided that the amounts deferred under the Plan are included in the Participants gross income in the latest of (i) the calendar year in which the Plan terminates; (ii) the calendar year in which the amount is no longer subject to a substantial risk of forfeiture or (iii) the first calendar year in which the distribution is administratively practicable; or

(c) Upon the Bank's termination of this and all other account balance plans (as referenced in Section 409A of the Code or the regulations thereunder), provided that all distributions are made no earlier than twelve (12) months and no later than twenty-four (24) months following such termination, and the Bank does not adopt any new account balance plans for a minimum of five (5) years following the date of such termination;

the Bank may distribute benefits under the Plan, to the Participants, in a lump sum subject to the above terms.

…

11.6. **Claims for Benefits.** Each Participant or other person claiming any benefit under this Plan must give written notification thereof to the Bank. If a claim is denied, it must be denied within a reasonable period of time, and be contained in a written notice stating the following: (a) the specific reason for the denial; (b)

---

with the Bank has been terminated. In addition, each other Participant employed by the Bank on the date of such amendment or termination shall be entitled to benefits (including survivor benefits) under this Plan, at such time as such benefits would have been paid absent such amendment or termination, in an amount equal to the amount that would have been paid under the Plan if he or she had terminated employment on the day immediately preceding the date of such amendment or termination of the Plan.

specific reference to the Plan provision on which the denial is based; (c) description of additional information necessary for the claimant to present his or her claim, if any, and an explanation of why such material is necessary; (d) an explanation of the Plan's claims review procedure. The claimant will have 60 days to request a review of any denial by the Board. The request for review must be in writing and delivered to the Board, which will then provide a full end fair review. The claimant may review pertinent documents, and he or she may submit issues and comments in writing. The decision by the Board with respect to the review must be given within 60 days after receipt of the request, unless special circumstances require an extension (such as for a hearing). In no event shall the decision be delayed beyond 120 days after receipt of the request for review. The decision shall be written in a manner calculated to be understood by the claimant, and it shall include specific reasons and refer to specific Plan provisions on which it is based.

…

     11.9. **Merger, Consolidation or Acquisition.** In the event of a merger or consolidation of the Bank with another corporation or entity, or the acquisition of the outstanding stock of the Bank by another corporation or entity, then and in such event the obligation and responsibilities of the Bank under this Plan shall be assumed by any such successor or acquiring corporation or entity, and all of the rights, privileges and benefits of the Participant hereunder shall continue.

(Trial Ex. 1.)

## 2. The Rabbi Trust

As noted above, Section 9.5 of the SERP allowed Royal Bank's Board of Directors to create a Rabbi Trust which could be funded for use with the SERP.  (Doc. No. 63 at 11-12 ¶ 70.) (Doc. No. 64 at 5 ¶ 24.)  SERPs are non-qualified retirement plans that are required by law to be unfunded.  (Doc. No. 64 at 5 ¶ 24.)  A Rabbi Trust is an exception to this requirement, allowing the SERP sponsor to set aside money for SERP participants.  (Id. ¶ 26.)  Essentially, it is a funding vehicle in which assets are placed and are subject to the benefit claims of SERP participants.  (Doc. No. 63 at 11 ¶ 60.)

Prior to 2013, Royal Bank used payroll funds to disburse monthly benefits to SERP participants. (Doc. No. 63 at 12 ¶ 67.)  Then, in 2013, an entity named Bank Financial Services Group ("BFS Group") became the SERP's financial advisor.   (Id.)  Richard Pearson ("Mr.

Pearson") and Michael Bruschini ("Mr. Bruschini"), both employees of BFS Group, became financial advisors to the SERP.  (Id. at 18 ¶ 124.)  BFS Group recommended that Royal Bank establish a Rabbi Trust as a pass-through account to make SERP payments.  (Id. at 12 ¶ 67.)

In January 2014, Royal Bank adopted the Royal Bancshares of Pennsylvania Inc. Rabbi Trust Agreement for the Supplemental Executive Retirement Plan ("the Rabbi Trust").  (Doc. No. 64 at 5.)  In turn, Royal Bank entered into an agreement with Commonwealth Trust Company ("CTC") for CTC to serve as the trustee of the Rabbi Trust.  (Id. ¶ 28-29.)  Below are relevant portions of the Rabbi Trust Agreement, modeled in part after the Internal Revenue Service ("IRS") Model Rabbi Trust Agreement.  (Doc. No. 63 at 12 ¶ 71.)

> **Section 1(a):** Bank hereby deposits with Trustee in trust cash in the amount of _____, which shall become the principal of the Trust to be held, administered and disposed of by Trustee as provided in this Trust Agreement.
>
> **Section 1(f):** Upon a Change of Control, as defined in the Plan, Bank shall, as soon as possible, but in no event longer than 90 days following the Change in Control, make an irrevocable contribution, if not already made, to the Trust in an amount that is sufficient to pay each plan participant or beneficiary the benefits to which plan participants or their beneficiaries would be entitled pursuant to the terms of the Plan as of the date on which the Change of Control occurred. …
>
> **Section 2(c):** Bank may make payment of benefits directly to plan participants or their beneficiaries as they become due under the terms of the Plan.  Bank shall notify Trustee of its decision to make payment of benefits directly prior to the time amounts are payable to participants or their beneficiaries.  In addition, if the principal of the Trust, and any earnings thereon, are not sufficient to make payments of benefits in accordance with the terms of the Plan, Bank shall make the balance of each such payment as it falls due until such time as the principal of the Trust is sufficient to make payments in accordance with the terms of the Plan.  Trustee shall notify Bank where principal and earnings are not sufficient. …
>
> **Section 12(b):** The Trust shall not terminate until the date on which Plan participants and their beneficiaries are no longer entitled to benefits pursuant to the terms of the Plan(s) Upon termination of the Trust any assets remaining in the Trust shall be returned to Bank.

(Ex. 2.)  (See also Doc. No. 63 at 12-13.)

When it was first created, the Rabbi Trust was funded with $1,000 more than what was needed to cover the initial set of benefit payments. [9]  (Id. ¶ 30.)  (See also Trial Transcript Day 1 128:7-15.)  (See also Ex. 32.)  Then, each month, Royal Bank funded the Rabbi Trust with an amount equal to that month's benefit payments.  (Id. ¶ 31.)  Over time, CTC would issue payments to SERP participants. [10]  (Id.)  This process continued every month until the SERP was terminated.  (Id. at ¶ 33.)

Against this backdrop, the Court turns to the facts involving Plaintiff Campbell's claim for an additional benefit amount using the 5-Year United States Treasury Note rate.

### 3.  Campbell's Participation in the SERP

Campbell became a SERP participant upon its adoption in 1998.  (Doc. No. 63 at 2.)  (Doc. No. 64 at 3.)  At that time, he was President and CEO of Royal Bank and served on its Board of Directors.  (See Trial Transcript 12:17-20.)  However, he did not play any role in drafting the SERP and did not negotiate his participation in the SERP.  (See Trial Transcript 12:17-20; 14:5-7.)

On December 24, 2008, Campbell stepped down as President of Royal Bank.  (Doc. No. 63 at 8 ¶ 46.)  (Doc. No. 64 at 3.)  Nonetheless, he agreed to stay on as an independent contractor through the end of 2009.  (Doc. No. 64 at 3.)  The terms of this role were set forth in two different documents: 1) an October 10, 2008 Transition and Separation Agreement and 2) a December 24,

---

[9]   "Overfunding" is allowed by the IRS Model Rabbi Trust.  (See Doc. No. 63 at 11 ¶ 63.)

[10]   Michael Thompson, Royal Bank's Chief Financial Officer, testified that this process did not happen "instantaneously" and he was not sure exactly how much time it would take.  (Trial Transcript Day 1 149:19-25; 150:1-6.)

2008 letter to Plaintiff from Greg Reardon, an independent director of Royal Bank, and James J.

McSwiggan Jr., Royal Bank's then Chief Operating Officer.  (Doc. No. 64 at 3-4 ¶ 16.)

The letter stated that Campbell's annual SERP benefit would be $347,000 annually, to be

payable in equal monthly installments, and would commence on January 1, 2010.[11]  (Id. at 4 ¶ 21.)

(See also Ex. 4.)  This amounted to $28,916.67 per month, which Campbell expected to receive

every month for the rest of his life.  (Id. at ¶ 21.)  From January 2010 to December 2017, Campbell

had no issues with his monthly SERP benefit.  (Id. at ¶ 23.)

### 4.  The Decision to Use the Citi Rate rather than the 5-Year United States Treasury Note rate.

In late January 2017, long after Mr. Campbell had retired from Royal Bank, Royal Bank

and BMT publicly announced its merger.[12]  (Doc. No. 50 at 10.)  (Doc. No. 64 at 7 ¶¶ 35-36.)  This

merger constituted a "Change of Control" as defined in Section 2.6 of the SERP.  (See Doc. No.

63 at 26 ¶ 168.)  (See also Doc. No. 64 at 9 ¶ 54.)

During negotiations on the merger, BMT informed Royal Bank that following the merger,

it intended to terminate the SERP.[13]  (Doc. No. 64 at 7 ¶ 38.)  (Trial Transcript Day 1 at 153:9-18.)

In this regard, BMT delegated responsibility for making decisions on termination to BMT's Chief

Financial Officer, Michael Harrington ("Mr. Harrington").  (Doc. No. 63 at 17 ¶ 115.)  (Doc. No.

64 at 8 ¶ 45.)  In turn, Mr. Harrington delegated the task of deciding how to accomplish the SERP's

---

[11]  The December 24, 2008 letter in effect changed the terms of the SERP as it applied to
Campbell.  (Doc. No. 64 at 4 ¶ 17.)  His SERP benefit was increased from $320,000 to $347,
000 because Campbell served as a consultant to Royal Bank for a year.  (Doc. No. 63 at 8 ¶
48.) (Doc. No. 64 at 4 ¶ 18.)

[12]  The merger was publicly announced on either January 30 or 31, 2017.  (Doc. No. 50 at 10.)

[13]  John May, the BMT Board Member, testified that BMT chose to terminate the SERP because
the SERP benefitted persons who were not management employees of BMT.  (See Trial
Transcript Day 2 at 19:8-12.)

termination to BMT's Treasurer, Keith McCutcheon ("Mr. McCutcheon").[14]  (Doc. No. 63 at 17

¶ 116.) (Doc. No. 64 at 8 ¶ 45.)[15]

On January 4, 2017, prior to the merger, Mr. Bruschini, one of the SERP's financial

advisors at the BFS Group, sent an email with valuation reports prepared by the Pangburn Group

(the "Pangburn Group Reports"),[16] the SERP's actuarial consultants, to Michael Thompson ("Mr.

Thompson"), Royal Bank's Chief Financial Officer, and Mr. Pearson, another financial advisor at

BFS Group.[17]  (Doc. No. 64 at 12-13 ¶ 68.)   The reports presented two scenarios on the financial

consequences to the SERP upon a Change of Control: 1) terminating the SERP using the actuarial

equivalent discount, or the Citi Rate, and 2) continuing the SERP and funding the Rabbi Trust

using the 5-Year United States Treasury Note rate.  (Trial Transcript Day 1 64:24-67:11.)  (Ex.

29.) (Ex. 41.) The distinction regarding continuing versus terminating the SERP was not outlined

in the email, but rather was discussed in a subsequent phone call.  (Trial Transcript Day 1 61:1-

25.)

---

[14]  Mr. McCutcheon did not play a role in the decision to terminate the SERP.   (Doc. No. 63 at
17 ¶ 117.)  (Doc. No. 64 at 8 ¶ 48.)

[15]  Mr. McCutcheon first read the SERP in Spring 2017, when he learned he was selected to
terminate the SERP.  (Trial Transcript Day 1 at 229:17-230:3.)

[16]  BFS Group worked with the Pangburn Group on the termination of the SERP.  (Doc. No. 64
at 14 ¶ 77.)   The Pangburn Group acted as the SERP's actuary from 2013 to 2017.  (Doc. No.
63 at 14 ¶ 92.)

[17]  The email was also sent to Mary Kay Shea, Chief Accounting Officer at Royal Bank, Preston
Fulco, a Pangburn representative, and Zachary Low, a field agent for BFS Group.  They did
not testify at the trial.  (See Doc. No. 64 at 14 ¶ 76.) (Trial Transcript Day 1 at 164:14-16.) (Ex.
29.)  They were also part of a subsequent phone call concerning the valuation reports.  (Trial
Transcript Day 1 at 61:1-25.)

Generally, the 5-Year United States Treasury Note rate is a lower discount rate than the Citi Rate.[18]  (Doc. No. 64 ¶¶ 71-72.)  When calculating the present value of SERP benefits, using a lower discount rate leads to a greater present value of the benefit amount, while using a higher discount rate leads to a smaller present value amount.  (Id. ¶ 73.)  Therefore, with all other inputs being equal, a calculation using the 5-Year United States Treasury Note rate would yield a higher benefit payment to a SERP participant than a calculation using the Citi Rate.  (Id. at 14 ¶ 74.)

This is exactly what the Pangburn Group Reports revealed: the calculation using the Citi Rate showed the SERP's present value to be $14,855,735, while the calculation using the 5-Year United States Treasury Note rate showed the SERP's present value to be $17,926,785.  (Ex. 41.)  Thus, the difference between using the Citi Rate and the 5-Year United States Treasury Note rate as the discount rate to calculate the lump sum payments to SERP participants was $3,071,050.  (Doc. No. 64 at 15 ¶ 81.)[19]

At trial, Mr. Thompson, the Royal Bank CFO, testified that when he first read the SERP, he was unsure which discount rate should be used to calculate the lump sum distribution because "the plan document" was not clear.[20]  (See Trial Transcript Day 1 177:3-8.)  Given that Sections 6.2 and 9.7(a) both related to a Change of Control, Mr. Thompson was unsure whether the 5-Year United States Treasury Note rate was the appropriate discount rate to be used for lump sum

---

[18]  As explained in Campbell's Proposed Findings of Fact and Conclusions of Law: "Typically low, the Treasury Rate is generally regarded as a relatively risk-free asset because it is viewed as unlikely that the United States government will default on its bonds."  (Doc. No. 64 at 13 ¶ 71.)  Further, "[t]he Citi Rate is nearly always higher than the Treasury Rate on account of the duration of the bonds in its hypothetical portfolio and their risk level."  (Id. ¶ 72.)

[19]  The money to fund the Rabbi Trust, which would in turn pay SERP benefits, would come from Royal Bank.  Following the Change of Control, these funds would come from Bryn Mawr Trust.

[20]  He further testified that he did not ask the Royal Bank Board for clarification as to what discount rate should be used.  (See Trial Transcript Day 1 160:23-161:5.)

distributions following the SERP's termination or whether a different discount rate should be used.
(Id.)

Mr. McCutcheon, BMT's Treasurer, was also unsure.  He also testified that he was unsure which discount rate should be used to calculate the lump sum distributions; however, he knew that lump sum payments calculated using the Citi Rate would be less expensive to BMT than lump sum payments calculated using the 5-Year United States Treasury Note rate.  (See Trial Transcript Day 1 at 231:24-232:10; 242:10-20.)   Regarding the discount rate, Mr. McCutcheon stated he was advised by Mr. Thompson, the former CFO of Royal Bank, Mr. Bruschini, the SERP financial advisor, and Mr. Pearson, another SERP financial advisor, as follows:

> First was that we were terminating the SERP not based on 6.2, but based on section -- I think it's 9.7(a), which is a change of control situation where the SERP could be terminated 30 days prior or one year after a change of control.  And it needed to be paid out in, quote, a lump sum, the lump sum being the equivalent of the actuarial equivalent as defined in section 2.2.  So, they're leading me through the document explaining how all this is working.

> Coming back to the 6.2, I was informed that doesn't really come into play with regard to the calculation of the payment of the benefits because the – using the five-year treasury rate only applied to funding the trust, you know, associated with the SERP, that the benefits would then be paid out.

> So, it was -- you know, that was the incoming money to the -- the trust, not the outflow from the trust.  The outflow was going to be based on -- said the definition 2.2, what an actuarial equivalent is, and that basically prescribed that however -- whatever methodology that was used to value the SERP liability on a balance sheet is the methodology that you should employ for the distribution of the payments if on a termination.

(Trial Transcript Day 1 at 232:11-233:21.)  The Pangburn Group agreed with this interpretation of the SERP, stating it is "industry practice."  (Trial Transcript Day 1 at 233:3-21.)

On June 5, 2017, Mr. Thompson sent the following email to Mr. Bruschini:

> I have been asked by some of our directors to update the calculation for the SERP plan if it is terminated after the change in control takes place.  Could you please update the report you ran in January assuming the plan is terminated after the

> change in control takes place.  [They] are asking to see how the amounts are
> calculated and what amount would be paid to each participant.

(Ex. 12 at D346.)  Mr. Bruschini responded to the above email by sending reports calculating the

present value of the SERP.[21]  (Ex. 13 at D715-716.)

On June 12, 2017, Mr. Thompson sent BFS Group an additional email inquiring into the

proper discount rate to be used in calculating the amount of the distribution to SERP participants

following a termination of the SERP.  (Ex. 12 at D344.)  Specifically, he asks: "Does this match

the plan? Would the 3.7% be the discount rate used after a [change in control]? I thought I recalled

the plan mentioning a Treasury rate."  (Id.)  In response to this inquiry, Preston Fulco, a Pangburn

Group employee, stated:

> There was a question we left up to the bank about which rate to use. In our
> conversations it appears that the plan discount rate would be used to value the
> benefits if the plan was terminated.  If the plan continued the plan calls for using
> the Treasury rate to determine the funding of a Rabbi Trust.  It doesn't specifically
> state to use the Treasury rate for actual payment calculations, just for funding. I
> believe that is something we were going to leave up to the attorneys to make a final
> decision on.

(Id.)

After receiving all this advice, Mr. McCutcheon, the BMT Treasurer, decided to calculate

the present value of SERP participants' benefits using the Citi Rate.  (Doc. No. 63 at 20 ¶ 134.)

(Doc. No. 64 at 19 ¶ 103.)  He did not notify or get approval from anyone at BMT regarding the

use of the Citi Rate.  (Trial Transcript Day 1 244:1-8.)  In December 2017, BMT management

presented a proposal to BMT's Board regarding the termination of the SERP.  (Trial Transcript

Day 2 23:6-12.)  The BMT Board approved the termination of the SERP.  (Id.)

---

[21]   When asked about these reports at trial, Mr. Bruschini, the SERP financial advisor, testified
that, based on the email, "it looks like the discount rate of the Citi Bank" was used in the
reports, but he did not know for sure.  (Trial Transcript Day 1 at 69:1-6.)

### 5. The Merger Closes and the SERP is Terminated

The merger closed on December 15, 2017 and Royal Bank merged into BMT. (Doc. No. 63 at 18 ¶ 113.) (Doc. No. 64 at 20 ¶¶ 112-13.) After the merger, BMT's Board of Directors became the SERP's Administrator. (Doc. No. 64 at 20 ¶ 114.) BMT terminated the SERP on December 18, 2017, the first business day following the merger. (Doc. No. 63 at 18 ¶ 114.)

As of November 30, 2017, the Rabbi Trust was funded with $18,480.99 from Royal Bank. (Ex. 33.) Prior to the termination of the SERP, the Rabbi Trust was funded with $1,699.04. (Ex. 32.) (Doc. No. 63 at 24 ¶ 160.) After calculating the present value of SERP benefits using the Citi Rate, BMT wired on December 26, 2017 the amount of $15,235,610.16[22] to CTC to fund the Rabbi Trust and make the lump sum distribution payments. (Ex. 34.) After all lump sum distributions were made to SERP participants, the Rabbi Trust had a balance of $1,699.05, which was refunded to BMT pursuant to the Rabbi Trust Agreement. (Ex. 35.) (Doc. No. 63 at 24 ¶ 161-63.)

### 6. Campbell Receives a Lump Sum Distribution.

On December 19, 2017, Campbell received a letter from BMT's Human Resources Department informing him that, because the merger between BMT and Royal Bank was finalized, the SERP was terminated and liquidated effective December 18, 2017. (See Ex. 25.) Further, the letter stated that "BMT will effectuate the termination and liquidation of the [SERP] prior to December 17, 2018" and the "remaining accrued and unpaid benefit" would be paid to him "in a single lump sum payment as soon as administratively practicable … ." (Id.)

---

[22]   This amount also covered administrative costs. (Ex. 34.)

On or about December 28, 2017, Campbell received a lump sum payment of $3,924,910 via a wire transfer.[23] (See Trial Transcript Day 1 at 16:13-23.) (See also Doc. No. 63 at 25 ¶ 171.) In a letter dated this same day, CTC outlined Campbell's lump sum distribution for him. (Id.) Campbell noticed some irregularities with his distribution, specifically the tax withholding applied to the distribution. (Doc. No. 64 at 23 ¶¶ 133-34.) To get an explanation, Campbell contacted Mr. Bruschini,[24] SERP financial advisor, who forwarded the explanations he received from Pangburn Group when they prepared the final calculations. (Id. at 24 ¶¶ 135-36.) This response included the fact that the discount rate used to calculate Campbell's lump sum payment was the Citi Rate. (Id. ¶ 138.) Based on the language of the SERP regarding Change of Control, Campbell believed that the 5-Year United States Treasury Note rate should have been used. (Id. ¶ 139.)

### 7.  Campbell submits a claim for an additional SERP Benefit to the BMT Board.

On January 23, 2018, Campbell submitted a clam to the BMT Board for additional SERP Benefits. (Id. ¶ 141.) (Doc. No. 63 at 26 ¶ 173.) In his claim, he noted that his benefits under the SERP were incorrectly calculated using the Citi Rate rather than the 5-Year United States Treasury Note rate. (Id.) BMT's Board created a Special Committee (the "Committee"), consisting of three Board members, to consider Campbell's claim. (Doc. No. 63 at 27 ¶ 178.) (Doc. No. 64 at 25 ¶ 142.) The three Committee members were: Mr. May, the BMT Board Member, Brit Murdoch, Chairman of BMT's Board, and Scott Jenkins, Chair of BMT's Board Audit Committee. (Doc. No. 63 at 28 ¶ 189.)

---

[23]  After receiving the lump sum payment, Campbell deposited it into an investment account, where, as of the date Plaintiff filed his Proposed Findings of Fact and Conclusions of Law, the money remained. (Doc. No. 64 at 23 ¶¶ 130-31.)

[24]  Campbell also contacted Charles Horn of CTC and Jennifer Stryker of BMT's Human Resources Department. (Doc. No. 64 at 30 ¶ 135.)

Now working for BMT, Mr. Thompson gathered for the Committee the documents he deemed relevant to Campbell's claim.  (Trial Transcript Day 1 184:1-14.)  Regarding this process, Mr. Thompson testified at trial: "I went for any records that we had, and I reached out to others who were involved in the process, and I worked with our counseling to get everything together." (Trial Transcript Day 1 184:16-18.)  Despite these efforts, Mr. Thompson said it was possible that the Committee did not have all the pertinent documents to review Campbell's claim.  (Id. at 185:18-20)  Relevant here, Mr. Thompson provided the Committee with a record of Mr. Bruschini's January 4, 2017 email, in which he shared the Pangburn Group's Reports, but did not include the actual reports that were attached to the email, showing the differences in value of SERP Benefits using the different discount rates.  (See Trial Transcript Day 1 at 186:9-25.)  Moreover, the Rabbi Trust Agreement was not included in the documents sent to the Committee.

Additionally, Mr. Thompson wrote a Memorandum to the Committee.   In the Memorandum, he explained BMT's decision to use the Citi Rate in calculating the lump sum distributions.  (Id. at 187:9-12.) (Ex. 18.)  The Memorandum provided the following explanations for the use of the Citi Rate: 1) it was actuarially equivalent to the rate used to value the SERP's liabilities on Royal Bank's financial statements; 2) the SERP mandated that BMT utilizes an "Actuarially Equivalent" rate in calculating the distributions;[25] and 3) that the 5-Year United States Treasury Note rate was only to be used for funding purposes under Section 6.2 of the SERP had the SERP continued in existence following Royal Bank's merger into BMT.[26]   (Ex. 18.)

---

[25] It was Mr. Thompson's understanding that the term "lump sum" payment in Section 9.7 implied using an Actuarial Equivalent calculation even though Actuarial Equivalent was not mentioned in Section 9.7.  (Trial Transcript Day 1 at 162:13-23, 163:2-9.)  At trial, Mr. Bruschini, Mr. Pearson, Mr. May, and Mr. McCutcheon agreed with this interpretation of the SERP.  (Doc. No. 63 at 5-6 ¶¶ 21-31.)

[26] The language of Section 6.2 does not support this interpretation. There is no language requiring the SERP to continue in existence.

Importantly, this memorandum did not disclose that Royal Bank had established a Rabbi Trust pursuant to SERP Section 9.5.  (See id.)

On April 17, 2018, the Special Committee met to review Campbell's claim.  The minutes from this meeting, which are an accurate summary of the meeting, (Doc. No. 63 at 30 ¶ 202), state the following:

> Kresge[27] stated that the discount rate used in calculating Campbell's lump sum (and consistently all other SERP participants' lump sums) was a rate based on the Citi Pension Liability Index that was used in 2017 and for many years before in calculating the SERP's liabilities.  Kresge stated that this Citi Index rate was the rate used for "Actuarial Equivalent" calculations under Section 2.2 of the SERP.  The Committee reviewed Citi's own definition of this Index as "based on a universe of AA rated corporate bonds."

(Ex. 19.)

> Thompson told the Committee that in 2017 (with the anticipated termination of the SERP by BMT post-acquisition), he asked the actuary for the SERP what discount rate should be used to calculate lump sums in the event of the SERP termination and what discount rate was traditionally used in calculating lump sums in the event of terminations of such plans.  Thompson told the Committee that the actuary responded that the Citi Index rate was the answer to both questions.

(Id.)

As pointed out by Campbell, these meeting minutes do not reflect the fact that Royal Bank had established a Rabbi Trust.  (Trial Transcript Day 1 at 188:11-18.)  (Trial Transcript Day 2 at 74:14-17.)  On this point, Mr. Thompson testified that it was his understanding that "it was implied that the Rabbi Trust" existed.  (Trial Transcript Day 1 at 188:11-18.)  Additionally, the minutes do not state that the Special Committee contacted any former Board member to discuss the correct interpretation of the SERP's terms.  (Trial Transcript Day 1 at 188:11-18.)  (Trial Transcript Day 2 at 74:14-17.)

---

[27]   Raymond Kresge, Defendant's outside counsel.  (Doc. No. 64 at 26 ¶ 151.)

At the conclusion of this meeting, the Committee denied Campbell's claim.  (Doc. No. 63 at 30 ¶ 203.)  (Doc. No. 64 at 27 ¶ 155.)  Campbell was notified of this denial in a letter dated May 18, 2018.  (Doc. No. 63 at 31 ¶ 204.)  (Doc. No. 64 at 27 ¶ 156.)  This letter included the following explanation as to why Campbell's claim was denied:

> Upon review, Section 6.2 of the SERP presents a discount rate to be used for funding what is known as a "Rabbi Trust" in the event of a Change in Control, not for calculation of lump sum distribution amounts in the event of a termination of the SERP.  More specifically, Section 6.2 requires that in the event of a Change in Control with no Section 9.7(a) termination, a trust in accord with Section 9.5 be established (if not already created) and funded at a level to satisfy all future SERP payments.  Section 9.5, titled "Authority to Establish a Trust," describes a Rabbi Trust in which assets are transferred to a trust to satisfy obligations and liabilities under the Plan, but with the understanding that the trust is subject to creditors' claims in the event of insolvency. . .
> ….
>
> Thus, on its face, Section 6.2, which only covers Rabbi Trust funding, does not provide the discount rate to be used for calculating lump sum distributions in the event of a termination of the SERP under Section 9.7(a).
> ….
>
> The 3.42% discount rate used to calculate the SERP lump sum distributions in December 2017 is based in a different section of the Plan, i.e., Section 2.2 for "Actuarial Equivalent" calculations. Section 2.2 provides:
>
> "Actuarial Equivalent" means, with respect to a given benefit, any other benefit provided under the terms of the Plan which has the same present or equivalent value on the date the given benefit commences, based on the use of actuarial equivalent factors adopted by the Bank and being used to value the Plan liabilities at the time of the calculation.
>
> One of those "actuarial equivalent factors" is a discount rate, and the discount rate being used to value the Plan liabilities in December 2017 (i.e., when the lump sum calculations were done) was based on the Citi Pension Liability Index ("Citi Rate").
> ….
>
> The lump sum calculations under Section 9.7(a) of the SERP are "Actuarial Equivalent" calculations -- that is, Mr. Campbell's lump sum under the SERP represents the actuarial equivalent of his annuity stream under the SERP.  Since Mr. Campbell's lump sum is an actuarial equivalent calculation, the discount rate used by the Plan under Section 2.2 (i.e., the Citi Rate in this case) is the correct rate to use to calculate Mr. Campbell's lump sum distribution

(Ex. 20.)

   **8.   Campbell Appeals the Denial of his Claim for an additional
         SERP Benefit.**

On June 22, 2018, pursuant to ERISA regulation 29 C.F.R. § 2560.503-1, Mr. Campbell

requested all documents relevant to his claim for additional SERP benefits.  (Doc. No. 64 at 29 ¶

161.)  BMT produced a number of documents for Mr. Campbell.  (Doc. No.  64 at 29 ¶ 162.)

On July 20, 2018, Campbell appealed the Special Committee's denial of his claim for

additional SERP benefits to the entire BMT Board of Directors.  (Id. ¶ 163.)  In response to the

appeal, Mr. Thompson authored on October 9, 2018 another memorandum to BMT's entire Board.

(Ex. 21.)  This memorandum stated in relevant part:

> Royal established a Rabbi Trust … for the SERP in January 2014, which was nearly
> seven years after the SERP was established and nearly four years before the change
> in control that led to the termination of the SERP.  Royal established that trust under
> the authority of Section 9.5 of the Plan under which "the Bank may transfer from
> time to time certain assets to be used by said trustee(s) to satisfy some or all of the
> Bank's obligations and liabilities under the Plan."  The Royal Rabbi Trust followed
> the IRS Model Trust and so had the above-referenced Section 2(c) addressing
> underfunding ("if the principal of the Trust, and any earnings thereon, are not
> sufficient to make payments of benefits in accordance with the terms of the Plan,
> Bank shall make the balance of each such payment as it falls due") and Section
> 12(b) addressing overfunding ("Upon termination of the Trust any assets remaining
> in the Trust shall be returned to the Bank").  As to the funding amount, Royal left
> the Section 1(a) funding amount blank and never funded the Rabbi Trust at all.  The
> Royal Rabbi Trust addressed the change in control event in Section 1(f) by
> requiring funding (should the SERP continue to exist)[28] in "an amount that is
> sufficient to pay each plan participant," which allows for a funding amount greater
> than the benefit obligations.  No actuarial principles are required to be followed in
> calculating that "sufficient" amount.

(Ex. 21 at D449-D450.)

---

[28]   Again, this requirement that the SERP continue to exist is not supported by the language in
Section 1(f) or, as noted, in Section 6.2.  Mr. Thompson is not a lawyer and is giving his
interpretation of the Sections.

On October 17, 2018, the full BMT Board met to consider Campbell's claim.  (Doc. No. 64 at ¶ 169.)  During this meeting, BMT's counsel advised: "Royal Bank had created – but not funded – a Rabbi Trust several years before BMT acquired Royal."  (AR[29] at D740.)  The Board was also advised that Campbell's challenge to the discount rate would result in a $368,650.47 higher lump sum payout and this "could potentially apply to all 26 Royal SERP participants."  (Ex. 21 at D443.)

At this meeting, the BMT Board denied Campbell's claim.  (Ex. 23.)  In making this decision, the BMT Board assumed that Mr. Thompson provided all the relevant documents.  (See Trial Transcript Day 2 at 74:21-25.)  Like the Special Committee, the BMT Board did not contact any of Royal Bank's former Board Members or attorneys at the time the SERP was amended to clarify the meaning of its terms.  (Trial Transcript Day 1 at 32 ¶ 75:21-24.)  (See also Doc. No. 63 at 34 ¶ 229.)

On November 15, 2018, BMT notified Campbell, via a letter, of the denial of his claim. In the letter, despite Campbell's argument that the 5-Year United States Treasury Note rate applied, the Board agreed with Campbell's statement that "the SERP does not expressly identify an appropriate discount rate to be used to value the lump sum benefit calculations in the event of a Section 409A change in control" and that "it is a matter of [SERP] interpretation."  (Doc. No. 63 at 37 ¶ 249.)  (Ex. 24.)  In denying the appeal, the Board noted that the following were the applicable sections of the SERP: 1) Section 9.7(a) which addresses a Plan's termination accompanying a change in control; 2) Section 2.2 which covers actuarial equivalence; and 3) Section 6.2 which addressed the funding of a Rabbi Trust in the event that the Plan is not terminated after a Change of Control.  (Doc. No. 63 at 37 ¶ 253.)  (Ex. 24.)

---

[29]  "AR" refers to the administrative record.

22

In its interpretation of the Plan, the Board concluded as follows:  1) under Section 6.2, the continuation of the SERP after a change in control is not the same thing as a termination of the SERP under Section 9.7(a) after a change in control; and 2) Section 6.2 and 9.7(a) compelled the use of different calculations – with Section 6.2 requiring the funding of a Rabbi Trust without any tie to the actuarial equivalent factors or actuarial principles and with Section 9.7(a) requiring "actuarial precision … in calculating the lump sum distribution of each Plan participant."  (Ex. 24.)  In sum, the Board concluded that Section 9.7(a) required the use of the Citi Rate in calculating the lump sum distribution payments upon termination of the SERP.

As discussed in detail <u>infra</u>, this letter also noted that Campbell and the BMT Board disagreed on the meaning of the phrase "subject to the above terms" at the end of Section 9.7 of the SERP.  (Id.)  The BMT Board believed that the phrase required the use of the "Actuarial Equivalent" rate, the Citi Rate, in calculating the lump sum payments following the termination the SERP.  (<u>Id.</u>)  In contrast, Campbell believed that "subject to the above terms" refers to the entirety of the SERP, which would lead to calculating the lump sum distribution using the 5-Year United States Treasury Note rate referred to in Section 6.2.  Moreover, the Board found that the 5-Year United States Treasury Note rate was a rate to be used only for funding the Rabbi Trust, and that the SERP makes a distinction between the funding rates and the rates to be used for valuing a lump sum distribution of benefits under the SERP.  (<u>Id.</u>)  Thus, even if the Rabbi Trust was funded using the 5-Year United States Treasury Note rate as described in Section 6.2, the lump sum distribution payments would still be paid to SERP participants using the Citi Rate.

### B.  Procedural History

Following this denial, which exhausted his appeals under Section 503 of ERISA, Campbell filed on February 25, 2019 the instant lawsuit.  (Doc. No. 1.)  On May 12, 2020, the parties filed

cross-motions for summary judgment.  (Doc. Nos. 26, 27.)  This Court denied both Motions in a November 30, 2020 Order.  (Doc. No. 38.)  A two-day bench trial was held on October 26 and 27, 2021.  (Doc. No. 56, 57.)  On January 13, 2022, the parties submitted Proposed Findings of Fact and Conclusions of Law.  (Doc. No. 63, 64.)  The Court heard closing arguments on January 21, 2022.

The parties agree that, had Campbell's lump sum distribution been calculated using the 5-Year Treasury Note rate, his gross distribution would have been $4,356,936 instead of $3,924,910. (Doc. No. 50 at 10.)  Therefore, Campbell is seeking as relief in this case, $432,026, plus interest, along with attorney's fees and costs.  (Doc. No. 64 at 35 ¶ 194.)  For reasons that follow, judgment will be entered in favor of Plaintiff Joseph Campbell and against Defendant the Royal Bank Supplemental Executive Retirement Plan.

## III.   CONCLUSIONS OF LAW

### A.  Top hat plans under ERISA and the Rabbi Trust

The SERP is a "top hat" plan.[30]    A "top hat" plan is "a defined benefit pension plan that does not require a limit on the amount of compensation that may be recognized."  Zebrowski v. Evonik Degussa Corp. Admin. Committee, 578 Fed.Appx. 89, 90-91 (3d Cir. 2014).  To qualify as a top hat plan, the plan must be: 1) unfunded; 2) designed primarily to provide retirement benefits to a select group of management or highly compensated employees; and 3) the benefits it

---

[30]   As noted earlier:

> Top hat plans allow executives with salaries above the compensation limit to ensure retirement income that is close to their pre-retirement income.  They permit an employee to defer some compensation until retirement, when the employee may be in a lower tax bracket.

578 Fed.Appx. 89, 90-91 n.2 (3d Cir. 2014).

provides must be subject to a substantial risk of forfeiture.[31]  (See Doc. No. 64 at 35 (citing 29 U.S.C. § 1051(2); 29 U.S.C. § 1081(a)(3); 26 U.S.C. § 409A; 26 C.F.R. § 1.409A-1.))  See also In re New Valley Corp., 89 F.3d 143, 148 (3d Cir. 1996) (A top hat plan is a 'plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly trained employees'").  Top-hat plans are unique compared to other ERISA plans and exempt from ERISA's vesting, funding, and fiduciary requirements.  Zebrowski, 578 Fed.Appx. at 91.  See also Goldstein v. Johnson and Johnson, 251 F.3d 433, 436 (3d Cir. 2001) ("Top hat plans are unfunded, they do not vest, and they are not required to name fiduciaries.")

Although top hat plans must be unfunded and are therefore paid out of the employer's assets, an employer may set aside the plan's assets in what is known as a "Rabbi Trust".  A Rabbi Trust does not jeopardize the plan's unfunded status as long as the amounts held in such trust are subject to the claims of the employer's general creditors in the event of insolvency or bankruptcy.  In Re IT Group, Inc., 448 F.3d 661, 665 (3d Cir. 2005).  However, the amounts held in a Rabbi Trust cannot be used for purposes other than paying top hat plan benefits.  Id.  Thus, in the event of a Change of Control, a Rabbi Trust provides top hat plan participants with security that an amount equal to the value of their benefits has been set aside for them.  Id.

---

[31]  ERISA Section 409A defines "substantial risk of forfeiture" as follows:

> The rights of a person to compensation are subject to a substantial risk of forfeiture if such person's rights to such compensation are conditioned upon the future performance of substantial services by any individual.

26 U.S.C. § 409A(d)(4).

B.  **Firestone Tire & Rubber Co.** and **Goldstein** Decisions

In <u>Firestone Tire & Rubber Co.</u>, the United States Supreme Court held that decisions by an ERISA plan administrator may receive deferential review (akin to an abuse of discretion standard) when the plan instrument grants the administrator discretion to make decisions for the plan.  489 U.S. 101, 111-15 (1989).  There, the Supreme Court explained that ERISA plans are analogous to "trusts" for an employee, with the plan administrator serving as trustee.  <u>Id.</u> at 111.  Therefore, a reviewing court owes deference to the discretionary decisions of the plan administrator, similar to the deference shown to discretionary decisions of a trustee.  <u>Goldstein</u>, 251 F.3d at 436 (discussing <u>Firestone Tire</u>, 251 F.3d at 435).

This reasoning is premised, however, on the analogy of an ERISA plan to a traditional trust.  <u>Id.</u> at 436.  But, in <u>Goldstein v. Johnson and Johnson</u>, the Third Circuit held that because a top hat plan is different from other ERISA plans, it should be treated as a unilateral contract rather than a trust.  <u>Id.</u> at 442-43.  Therefore, administrators of top hat plans, like the SERP here, receive deference for their administrative decisions only if the plan has "a written clause explicitly granting authority to the plan administrator to interpret the terms of the plan."  <u>Id.</u> at 436.  This grant of discretion must be reasonable, exercised with an "implied duty of good faith and fair dealing[,]" and is interpreted "[a]s a term of the contract, [and] … given effect as ordinary contract principles would require[.]"  <u>Id.</u> at 436, 444.  This is known as <u>Goldstein</u> deference.

If the top hat plan does not grant this discretion, the decision of the plan administration are reviewed <u>de novo</u> and "neither party's interpretation should be given precedence over the other's, except in accordance with ordinary contract principles."  <u>Id.</u> at 442-43.  "Whether a plan administrator's exercise of power is mandatory or discretionary depends upon the terms of the plan."  <u>Viera v. Life Ins. Co. of North America</u>, 642 F.3d 407, 413 (3d Cir. 2011) (quoting <u>Luby</u>

v. Teamsters Health, Welfare, & Pension Trust Funds, 944 F.2d 1176, 1180 (3d Cir. 1991)).  No "magic words" determine the scope of judicial review of decisions to deny benefits, and discretionary powers may be granted expressly or implicitly.  Viera, 642 F.3d at 413.  "The plan administrator bears the burden of proving that the [abuse of discretion] standard of review applies." Id. (quoting Kinstler v. First Reliance Std. Life Ins. Co., 181 F.3d 243, 249 (2d Cir. 1999)).

Therefore, in order to determine what standard of review applies here, either abuse of discretion or de novo, this Court must first determine whether the SERP grants the BMT Board Goldstein deference in making its administrative decisions, and more specifically whether the SERP grants authority to the BMT Board to select the discount rate in calculating lump sum payments following a Change of Control.

### C.  BMT Board's Interpretation of the SERP is subject to de novo review

Here, the first matter that must be confronted is whether the SERP is subject to de novo review as it relates to the choosing of the discount rate for calculating lump sum payments upon a Change of Control.   In general, Defendant argues that Sections 9.1 ("General"), 9.3 ("Interpretation"), and 11.6 ("Claim for Benefits") of the SERP grant the BMT Board discretion to interpret the plan in accordance with Goldstein.  (Doc. No. 63 at 2 ¶ 11.)  In doing so, Defendant asserts that its interpretation of the SERP, specifically the use of the Citi Rate when calculating Campbell's lump sum payment, is entitled to deference so long as BMT's Board exercised its discretion reasonably and in good faith.  (Id. ¶ 12.)  See also Goldstein, 251 F.3d at 444-45.

Conversely, Campbell asserts that the SERP does not confer discretionary authority to adjudicate claims and determine the appropriate discount rate used for SERP termination payments.  (Doc. No. 64 at 40.)  Among other things, Campbell points to various provisions of the SERP that, in fact, specifically use the word "discretion", and argues that none of these provisions

relate to the adjudication of claims for benefits or the selection of the discount rate to be used upon termination of the SERP.  (Id. at 41.)

### 1.  Sections 9.1 and 9.3

Defendant's suggestion that SERP Sections 9.1 and 9.3 grant the BMT Board discretion to interpret the SERP, particularly as is relates to the choosing of a discount rate when terminating the SERP upon a Change of Control, is misplaced.  While these Sections are quoted above, they bear repeating here:

> 9.1.  **General.** The Plan shall be administered by the Board or its designee. The Board shall have the authority, <u>subject to the terms of the Plan</u>, to construe the provisions of the Plan and to adopt rules and regulations and make all determinations necessary or advisable for the administration of the Plan.

> 9.3.  **Interpretation.** The interpretation and construction of the Plan by the Board, and any action taken hereunder, shall be binding and conclusive upon all parties in interest.[32]

(See Ex. 1) (emphasis added).

According to the plain text of these Sections, it is clear that Board has the authority to construe provisions of the SERP, but this authority is <u>subject to the terms of the Plan</u>.  This caveat distinguishes the SERP here from the plan in <u>Goldstein</u>, where the provision granting authority was broad and without limitation, in that the administrator was given "sole authority" to "interpret provisions" of the plan.  <u>Goldstein</u>, 251 F.3d at 436.

Post-<u>Goldstein</u> case law from this Circuit highlights this difference.  In <u>Zebrowski v. Evonik Degussa Corp. Administrative Committee</u>, the Third Circuit explained:

> The "broad" grant of discretion in the top hat plan at issue in <u>Goldstein</u> gave the administrator " 'sole authority' to '[i]nterpret the provisions' of the plan."  The Supplemental Plan at issue here grants a similar degree of discretion to the Committee. Article XV of the 1999 Supplemental Plan, at section 15.2.3, gives the

---

[32] Considering Sections 9.1 and 9.3 together, they seem to say in pertinent part that, subject to the terms of the SERP, the Board construes the provisions of the SERP and that such construction is binding and conclusive upon all parties in interest.

> Committee the authority to "[i]nterpret[ ] the provisions of the Plan in all
> particulars." (J.A. at 240.) … [the] Plan is sufficient to establish the Committee's
> discretionary authority.

578 Fed.Appx. at 94-95 (internal citations omitted).  Similarly, in <u>McCusker v. Penn Fuel Gas,</u>

<u>Inc. Supplemental Executive Retirement Program</u>, the agreement at issue contained the following

clause:

> 5(a) Administration of Program.  The Program shall be administered by a
> committee appointed by the Board of Directors (the "Committee").  Such
> Committee shall have full power, discretion and authority to interpret, construct
> and administer the Program and any part thereof and its decisions shall be final and
> binding on all parties.

Civ. No. 01-0874, 2003 WL 216 40572 at *3 (E.D. Pa. July 11, 2003).  Again, the court found that

this provision was similar to the one at issue in <u>Goldstein</u> and applied <u>Goldstein</u> deference to the

plan administrator's interpretation of the plan.  <u>Id.</u> at *3.

On the other hand, in <u>Hacala v. Spencer Gifts, LLC</u>, the court applied a <u>de novo</u> standard

of review.  Civ. No. 04-6061, 2006 WL 2241636 (D.N.J. August 2, 2006).  In <u>Hacala</u>, the defendant

claimed the following language granted them <u>Goldstein</u> deference:

> The entitlement of a Plan participant or his or her beneficiaries to benefits under
> the Plan(s) shall be determined by Company or such party as it shall designate under
> the terms of the Plan(s), and any claim for such benefits shall be considered and
> reviewed under the procedures set out in the Plan(s).

<u>Id.</u> at *6.  The court explained that the language "shall be determined by the Company or such

party as it shall designate under the terms of the Plan(s)" "stands in starks contrast" to the language

at issue in <u>Goldstein</u>.  <u>Id.</u>  The court held that because this language "neither vests the plan

administrator with <u>sole discretion</u> nor states that decisions of the plan administrator are final and

conclusive" <u>de novo</u> review applied.  <u>Id.</u> (emphasis added).

Here, while Section 9.3 provides language that all decisions by the BMT Board "shall be

binding and conclusive upon all parties in interest", Section 9.1 does not state that BMT Board

29

shall have sole discretion to interpret provisions of the SERP.  Thus, under the reasoning provided in <u>Hacala</u>, that a plan needs to provide for <u>both</u> sole discretion <u>and</u> finality of decisions (emphasis added) to receive <u>Goldstein</u> deference, which the SERP here does not have, the SERP will be reviewed <u>de novo</u>.

In fact, as pointed out by Campbell, the word "discretion" does not appear in Section 9.1. But it does appear in many other sections of the SERP.  The following SERP provisions use the term "discretion":

Section 3.1:

> Eligibility.  The Board, **in its sole discretion**, shall select the employees of the Bank who are eligible to become Participants.  Notwithstanding the foregoing, effective January 1, 2003, in order to become a Participant in the Plan, an employee of the Bank must have completed a minimum of 10 Years of Service.

Section 4.4:

> Alternate Form of Payment. The Bank may, **in its sole and absolute discretion**, approve a retiring Participant's request of an alternate form of life annuity in which case such payments shall be in the amount of the Actuarial Equivalent of the normal form of benefit hereunder.  No installment or lump sum payments shall be permitted under this Section 4.4.

Section 4.6:

> Loan of Portion of Benefits.  … If the Wall Street Journal prime rates are no longer published, the interest rate shall be based on some other similar published rate selected by the Board **in its sole discretion.**

Section 6.2:

> Change of Control.  … [I]f at the time a Change in Control occurs, the Bank had established a trust in accordance with Section 9.5 hereof, the Bank shall be required to transfer cash and/or other assets to said trust in an amount equal to the discounted present value of all of the future benefits payable hereafter to each Participant and Beneficiary.  If the Bank had not previously established a trust in accordance with Section 9.5 hereof, a trust shall be established at the time a Change of Control occurs, and the above funding requirements will apply to said trust. The discount rate shall be the 5-Year United States Treasury Note rate as published on the first day of the month immediately preceding the date on which the determination is

made, compounded annually. If these rates are no longer published, the discount
rate shall be some other similar average selected by the Board **in its sole discretion.**

Section 9.4

Authority to Appoint a Committee.  The Board, **within its discretion**, shall have
the authority to appoint a Compensation Committee of not less than three (3) of its
members which shall have authority over the Plan in lieu of the entire Board.

Section 10.1

Bank Owns All Rights.  … In the event, **in its discretion,** the Bank purchases a life
insurance policy or policies insuring the life of any Participant to allow the Bank to
informally finance and/or recover, in whole or in part, the cost of providing the
benefits hereunder, neither the Participant nor any Beneficiary shall have any rights
whatsoever therein.

Section 10.3

Participant Misrepresentation.  If: (a) any Participant is required by this Plan to
submit information to any insurance carrier; and (b) the Participant makes a
material misrepresentation in any application for such insurance; and (c) as a result
of that material  misrepresentation the insurance carrier is not require to pay all or
any part of the proceeds provided under that insurance, then the Participant's (or
the Participant's Beneficiary's) rights to any benefits under this Plan may be, **at the
sole discretion of the Board**, reduced in proportion to the reduction of proceeds
that is paid by the insurance carriers because of such material misrepresentation.

Section 11.1

Non-Alienation of Benefits.  If a Participant or any Beneficiary hereunder shall
become bankrupt, or attempt to anticipate, alienate, sell assign, pledge, encumber,
or charge any right hereunder, then such right or benefit shall, in the **discretion of
the Board** cease and terminate, and in such event, the Board may hold or apply the
same or any part thereof for the benefit of the Participant or his or her Beneficiary,
spouse, children, or other dependents, or any of them in such manner and in such
amounts and proportions as the Board may deem proper.

(See Ex. 1) (emphasis added).

These provisions do not grant discretion as to the selection of the discount rate, except

under the limited circumstance in Section 6.2 when the 5-Year United States Treasury Note rate

is no longer published, which did not occur in this case.  And the use of the word "discretion" in

various Sections of the SERP and its omission from Section 9.1 and 9.3 strongly suggests that the

drafters of the SERP did not intend to provide the plan administrator, the BMT Board, with sole discretionary authority.  Authority was granted, but confined by the phrase "subject to the terms of the Plan."  (Id.)

In Luby v. Teamsters Health, Welfare & Pension Trust Funds, an ERISA case, albeit one not involving a "top hat" plan, the Third Circuit held that a plan's general grant of administrative power to the plan's trustees did not imply authority to decide specific disputes between beneficiary claimants.  944 F.2d 1176, 1180 (3d Cir.1991).  In reaching this conclusion, the court held that an express grant of discretion in one specific area of the plan undermined a claim that the administrator possessed implied discretion in another area of the plan.  Id.  An express grant in one area demonstrated that, had the drafters intended to grant discretion in another area, "they knew how to say so and would have expressly done so."  Id. at 1181.

Similarly, in Campbell's case here, if the drafters of the SERP wanted to grant the plan administrator broad discretion, they would have expressly said so without making their authority subject to the terms of the SERP and more specifically without pointing to instances in the SERP when the administrator was indeed given broad discretion to act.  Moreover, if the drafters wanted to grant discretion to the plan administrator when it came to selection of a discount rate for terminating the SERP upon a Change of Control where there was a Rabbi Trust in place, it would have granted such discretion rather than requiring the use of the 5-Year United States Treasury Note rate.

In this regard, under Section 6.2, it is mandatory to use this rate to fund a Rabbi Trust upon a Change of Control.  Importantly, Section 6.2 provides: "The discount rate **shall** be the 5-Year

United States Treasury Note rate." [33] (Ex. 1.) (emphasis added).  The word "shall" is defined as "has a duty to; more broadly, is required to."  Black's Law Dictionary 1585 (10th ed. 2014). Black's Law Dictionary further states: "This is the mandatory sense that drafters typically intend and that courts typically uphold."  Id.  Thus, this provision of the SERP provides no discretion in terms of choosing the discount rate for funding the Rabbi Trust upon a Change of Control.  Rather, it uses mandatory language that the discount rate must be the 5-Year United States Treasury Note rate.  And, under Section 6.2, this rate is used to calculate "an amount equal to <u>the present value of all of the future benefits payable hereunder</u> to each Participant and beneficiary" that the Board must transfer into the Rabbi Trust (emphasis added).

This reading is consistent with SERP Section 9.1.  As shown above, this Section expressly provides that the administrators authority to construe the SERP is "subject to the terms of the Plan."  (<u>See</u> Doc. No. 64 at 42.)  When it comes to the selection of the discount rate following a Change of Control, the administrator's authority is subject to Section 6.2.  Therefore, Sections 9.1 and 9.3 do not grant BMT's Board broad discretionary authority to interpret provisions of the SERP as it relates to the choice of the discount rate following a Change of Control.

### 2.  Section 11.6

Additionally, Section 11.6 does not confer sole discretion on the BMT Board.  This Section provides:

> Claims for Benefits.  Each Participant or other person claiming any benefit under this Plan must give written notification thereof to the Bank.  If a claim is denied, it must be denied within a reasonable period of time, and be contained in a written notice stating the following: (a) the specific reason for the denial; (b) specific reference to the Plan provision on which the denial is based; (c) description of

---

[33]   As previously discussed, Defendant argues that Section 6.2 is inapplicable to Campbell's claim because it only applies if the SERP continued following a Change of Control.  (<u>See</u> Trial Transcript Day 1:180-18-25; 181:1-3.)  The Court disagrees.  The proper interpretation of the SERP will be discussed <u>infra</u>.

additional information necessary for the claimant to present his or her claim, if any, and an explanation of why such material is necessary; (d) an explanation of the Plan's claims review procedure.  The claimant will have 60 days to request a review of any denial by the Board.  The request for review must be in writing and delivered to the Board, which will then provide a full and fair review.  The claimant may review pertinent documents, and he or she may submit issues and comments in writing.  The decision by the Board with respect to the review must be given within 60 days after receipt of the request, unless special circumstances require an extension (such as for a hearing).  In no event shall the decision be delayed beyond 120 days after receipt of the request for review.  The decision shall be written in a manner calculated to be understood by the claimant, and it shall include specific reasons and refer to specific Plan provisions on which it is based.

This Section does not provide any discretionary authority.  Rather, it merely lays out the procedure for adjudication of claims for SERP benefits.  Therefore, the BMT Board's interpretation of the SERP as it relates to Campbell's claim for additional benefits will be reviewed de novo.[34]

### D. The BMT Board did not properly interpret the SERP when it applied the Citi Rate in calculating Campbell's lump sum payment rather than using the 5-Year United States Treasury Note rate.

After careful review of the SERP and the extrinsic evidence set forth at trial, it is clear that the BMT Board incorrectly interpreted the SERP when it applied the Citi Rate in calculating Campbell's lump sum payment.

#### 1. Legal Standard

When exercising de novo review, the role of the court "is to determine whether the administrator … made the correct decision."  Viera, 642 F.3d at 413 (quoting Hoover v. Provident Life & Accident Ins. Co., 290 F.3d 801, 808-809 (6th Cir. 2002)).  "The administrator's decision is accorded no deference or presumption of correctness."  Id. (quoting id. at 809).  Because the

---

[34]   Even if the Board's interpretation of the SERP in regard to Campbell's claim was discretionary and subject to Goldstein deference, he would still be entitled to the additional benefits.  See Section E, infra.

34

SERP is a top hat plan, it is interpretated as a unilateral contract and "neither party's interpretation should be given precedence over the other's, except in accordance with ordinary contract principles." Goldstein, 251 F.3d at 442-43. Therefore, when interpreting the SERP, the Court must apply federal common law of contracts. See Goldstein, 251 F.3d at 444; In re New Valley Corp., 89 F.3d 143, 149 (3d Cir. 1996).

When interpreting a contract, a court's primary objective is to derive the objective intent of the parties at the time of making of the contract. In re Combustion Engineering, Inc., 366 F.Supp.2d 244, 229 (D. Del. April 21, 2005) (citing Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1009 (3d Cir. 1980)). In determining the intent of the parties, the court is concerned with the "objective manifestations of [the parties] intent." Id. at 230. To aid in determining the intent of the parties, courts may allow the parties to offer evidence that sheds light on their objective intent. Id. (citing In re New Valley Corp., 89 F.3d 143, 149 (3d Cir. 1996)). The Third Circuit has adopted a comprehensive approach to contract interpretation that relies not only upon the language of the contract,[35] but also the evidence offered by the parties if the contract's terms are unclear. Id.

Under this approach, before the language of a contract is considered ambiguous, the court "hear[s] the proffer of the parties and determines if there are objective indicia that from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings." Id. (quoting Mellon Bank, 619 F.2d at 1011.) A contract is not ambiguous simply because both parties disagree over the construction of terms in the contract. Id. To the contrary,

---

[35] The Third Circuit Court of Appeals has rejected a strict application of the "four-corners" approach. In re Combustion Engineering, Inc., 266 F.Supp.2d at 230 (citing In re New Valley Corp., 89 F.3d 143, 149 (3d Cir. 1996)). See also Bohler-Uddeholm America, Inc., v. Ellwood Group, Inc., 247 F.3d 79, 93 (3d Cir. 2001) ("A court may, however, look outside the 'four corner' of a contract if the contract's terms are unclear").

an interpretation which renders a term or terms superfluous or meaningless...."); Restatement (Second) of Contracts, 203 ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect....").

With these principles in mind, the Court will turn to the language of the SERP.

### 2. Section 6.2 of the SERP is not susceptible to two different interpretations.

Section 6.2 of the SERP unambiguously states that if a Rabbi Trust had been established at the time of a Change of Control, it must be funded using the 5-Year United States Treasury Note rate. While the language of Section 6.2 is quoted throughout the Opinion, it is important to repeat it here.

> 6.2. **Change of Control.** Notwithstanding anything to the contrary herein, if a Participant's employment with the Bank is terminated, other than by retirement, death, Disability, or Termination for Cause, within two (2) years of a Change of Control of the Bank, then, for purposes of this Plan, it shall be deemed that the Participant has remained in the employ of the Bank until the earlier to occur of: (a) the Participant's death; or (b) the Participant's attaining his or her Normal Retirement Age, except as provided in Section 4.2 herein. **Furthermore, if at the time a Change of Control occurs, the Bank had established a trust in accordance with Section 9.5 hereof, the Bank shall be required to transfer cash and/or other assets to said trust in an amount equal to the discounted present value of all of the future benefits payable hereunder to each Participant and Beneficiary**. If the Bank had not previously established a trust in accordance with Section 9.5 hereof, a trust shall be established at the time a Change of Control occurs, and the above funding requirements will apply to said trust. **The discount rate shall be the 5-Year United States Treasury Note rate as published on the first day of the month immediately preceding the date on which the determination is made, compounded annually.** If these rates are no longer published, the discount rate shall be some other similar average selected by the Board in its sole discretion.

(Ex. 1 at D10-D11.) (emphasis added.)  The language of Section 6.2 of the SERP clearly mandates that the discounted present value of all future benefits are calculated using the 5-Year United States Treasury Note rate and that amount must be placed into a Rabbi Trust upon a Change of Control.

Here, a Rabbi Trust had been established before Royal Bank merged with BMT.[36]  (Ex. 2 at D730.)  Further, as noted supra, the word "shall" is defined as "has a duty to; more broadly, is required to."  Black Law's Dictionary 1595 (10th ed. 2014).  See also Wegmann v. Young Adult Institute, Inc., 2021 WL 3573753 at *1 (2nd Cir. 2021) (noting that the use of the word "shall" in a SERP provision means that it is mandatory).  Thus, according to the plain text of the Section 6.2, upon a Change of Control, the Rabbi Trust had to be funded with an amount equal to the discounted presented value of all the future benefits payable to each participant, using the 5-Year United States Treasury Note rate.  In Campbell's case, the Rabbi Trust was improperly funded using the Citi Rate and his lump sum was subsequently paid out using the Citi Rate.  (Doc. No. 63 at 18-20.)

Defendant presents two primary arguments to support its use of the Citi Rate: 1) Section 6.2 only applied if BMT decided to continue the SERP following the merger with Royal Bank and 2) the 5-Year United States Treasury Note rate is only a funding rate intended to permit overfunding of a Rabbi Trust upon a Change of Control (id. at 7 ¶¶ 40-41).   According to Defendant, because the 5-Year United States Treasury Note rate is only a funding rate, lump sum

---

[36]  Defendant places emphasis on the fact that while a Rabbi Trust had been "established" when the Change of Control occurred, it had never been "funded."   (Doc. No. 63 at 13 ¶ 78.)  This distinction has no bearing under Section 6.2 because it requires use of the 5-Year Treasury Note Rate if the Bank had established a trust.  (Ex. 1 at D10-D11) (emphasis added.)  In any event, the Rabbi Trust was in fact funded with a small amount of money.  For example, as of November 30, 2017, the Rabbi Trust was funded with $18,480.99, and prior to the termination of the SERP, the Rabbi Trust was funded with $1,699.04.  (Ex. 32.) (Ex. 33.) (Doc. No. 63 at 24 ¶ 160.)

38

distributions can be paid out using the Citi Rate.[37]  In making these contentions, Defendant relies

heavily on the advice of the SERP's actuaries, financial advisors, and attorneys.  (See, e.g, Ex. 19.)

However, nothing in Section 6.2 states that in order for the section to be applicable, the

SERP had to continue beyond a Change of Control.  (See Ex. 1.)  Similarly, Section 6.2 does not

contemplate the overfunding of the Rabbi Trust.  (Id.)  On the contrary, the plain language of

Section 6.2 provides that the Rabbi Trust should be funded "in an amount equal to the discounted

present value of all of the future benefits payable hereunder to each Participant" and that the

discount rate shall be the 5-Year United States Treasury Note rate.  (Id.)  Thus, when calculating

the discounted present value of all benefits payable to participants, it was mandatory that the SERP

administrator use the 5-Year United States Treasury Note rate to calculate benefits and fund the

Rabbi Trust with that exact amount.  Concluding otherwise would violate the plain language of

Section 6.2.  See Kemmerer v. ICI Americas Inc., 79 F.3d 281, 289 (3d Cir. 1995) (concluding

that when the terms of an ERISA plan are unambiguous, disregarding the language violates the

plain meaning rule of contract interpretation).

The terms of the Rabbi Trust Agreement support this conclusion.  Section 1(f) of the Rabbi

Trust agreement provides:

> Upon a Change of Control, as defined in the Plan, Bank shall, as soon as possible,
> but in no event longer than 90 days following the Change in Control, make an
> irrevocable contribution, if not already made, to the Trust in an amount that is
> sufficient to pay each plan participant or beneficiary the benefits to which plan
> participants or their beneficiaries would be entitled pursuant to the terms of the Plan
> as of the date on which the Change of Control occurred.

---

[37]  Money remaining in the Rabbi Trust because of the mistaken or intentional overfunding after
payment of the lump sums would be returned to BMT pursuant to Paragraph 12(b) of the Rabbi
Trust document.  (Doc. No. 63 at 35 ¶ 237.)  Section 6.2 does not say overfunding may not
occur; it only sets minimum terms that must be followed.

(Ex. 2 at 731.)  Black's Law Dictionary defines the term "sufficient" as: "adequate; of such quality, number, force, or value as is necessary for a given purpose."  Black Law's Dictionary 1661 (10th ed. 2014).  "Sufficient" does not means in excess.  Thus, the language of the Rabbi Trust does not support an interpretation that the Rabbi Trust is meant to be overfunded upon a Change of Control.

In addition, multiple witnesses testified at trial that when the BMT Board decided Section 6.2 only applied if BMT chose to continue the SERP following the Change of Control and that the 5-Year United States Treasury Note rate is only a funding rate, neither the Special Committee nor the BMT Board had contacted any Royal Bank Board Members on the Board at the time the SERP was amended in 2005 to clarify the meaning of its terms.  (Trial Transcript Day 1 at 188:11-18.) (Id. at 32 ¶ 75:21-24.)  Had they done so, such evidence would have contributed to the Court's primary objective, which is to derive the objective intent of the parties at the time of the SERP was amended.  See Mellon Bank, 619 F.2d at 1009.  Thus, Defendant has failed to produce evidence that it was the original intent of the parties at the time the SERP was drafted, or later amended, that Section 6.2 only applied if the SERP continued beyond a Change of Control.  The same holds true for the use of the 5-Year United States Treasury Note rate as a funding rate intended solely to permit overfunding of a Rabbi Trust upon a Change of Control.

Finally, Defendant's reliance on its "experts", who recommended use of the Citi Rate, does not insulate it from liability because it was still the BMT Board's responsibility to properly interpret the SERP.  These experts include: Mr. Thompson, the former Royal Bank CFO, Mr. Bruschini and Mr. Pearson, the SERP financial advisors, the Pangburn Group, the SERP's actuarial consultants, and Defendant's attorneys.  (Trial Transcript Day 1 at 232:11-233:21.)  When evaluating an ERISA plan administrator's use of experts, a court considers the following factors: 1) whether the administrator investigated the expert's qualifications; 2) whether the expert was

provided with complete and accurate information; and 3) whether the reliance on the expert's advice was reasonably justified under the circumstances.   Addington v. Senior Vice President-Human Resources, Civ. No. 17-444, 2019 WL 3416098 at *7 (W.D. Pa. March 15, 2019) (quoting Gregg v. Transp. Workers of Am. Int'l, 343 F.3d 833 (6th Cir. 2003)).

Here, there is no evidence to suggest that the BMT Board did not properly investigate the experts' qualifications.  Similarly, there is no suggestion that the experts were not provided with complete and accurate information regarding the SERP.  Nonetheless, because the BMT Board's reliance on experts caused them not to follow clear provisions of the SERP, this reliance on experts was unreasonable.[38]  See DeWitt v. Penn-Del Directory Corp, 106 F.3d 514, 517 (3d Cir. 1997) (finding an abuse of discretion when the plan administrator's interpretation "controvert[ed] the plain language of the [p]lan.").

### 3. The phrase "subject to the above terms" in Section 9.7 of the SERP is ambiguous.

The parties and the Court agree that Section 9.7 is ambiguous.   (See Doc. No. 63 at 27 ¶ 179; 43 ¶ 278.)  (See Trial Transcript Day 2 27:2-6.)  As noted earlier, John May, a lawyer and BMT Board Member, on the second day of trial testified that the SERP is "frankly, a poorly drafted plan."  (Id.)

The gravamen of the parties' disagreement is the meaning of the phrase "subject to the above terms."   As formerly mentioned, Section 9.7 provides:

9.7. **Plan Termination under Section 409A.** Notwithstanding anything to the contrary in Section 9.6, if the Bank terminates the Plan in the following circumstances:

(a) Within thirty (30) days before, or twelve (12) months after a Change in Control, provided that all distributions are made no later than twelve (12) months

---

[38]   More analysis about the unreasonableness of the BMT Board's interpretation of the SERP is discussed infra.  See Section E(5).

following such termination of the Plan and further provided that all the Company's plans and arrangements which are substantially similar to the Plan are terminated so the Participants and all participants in similar plans and arrangements are required to receive all amounts of compensation deferred under the terminated plans and arrangements within twelve (12) months of the termination of the plans and arrangements;

(b) Upon the Bank's dissolution or with the approval of a bankruptcy courts provided that the amounts deferred under the Plan are included in the Participants gross income in the latest of (i) the calendar year .in which the Plan terminates; (ii) the calendar year in which the amount is no longer subject to a substantial risk of forfeiture or (iii) the first calendar year in which the distribution is administratively practicable; or

(c) Upon the Bank's termination of this and all other account balance plans (as referenced in Section 409A of the Code or the regulations thereunder), provided that all distributions are made no earlier than twelve (12) months and no later than twenty-four (24) months following such termination, and the Bank does not adopt any new account balance plans for a minimum of five (5) years following the date of such termination;

the Bank may distribute benefits under the Plan, to the Participants, in a lump sum <u>subject to the above terms</u> (emphasis added).

Campbell asserts that "subject to the above terms" includes the entirety of the SERP's terms proceeding Section 9.7, including Section 6.2. (Trial Transcript Day 2 27:2-6.) On the other hand, Defendant contends that "subject to the above terms" is referring only to the terms of Section 9.7, (id.), and asserts that Section 6.2 is not applicable when calculating a lump sum payment after termination of the SERP upon a Change of Control.

For the reasons that follow, the Court will adopt Campbell's interpretation of the SERP and resolve the ambiguity in the phrase "subject to the above terms" in Section 9.7 to refer to the entirety of the language of the SERP proceeding that section.

42

a. **Defendant's application in Section 9.7 of the SERP of "Actuarial Equivalence" in Section 2.2 is misplaced because Section 9.7 does not require "Actuarial Equivalence".**

One explanation offered by Defendant's for using the Citi Rate is that the "actuarial equivalent" discount rate was historically used to value SERP liabilities.  (See Ex. 24 at 741.) Despite the absence in Section 9.7 of any reference to "actuarial equivalent", multiple witnesses at trial testified that the term "lump sum" in Section 9.7 required using the actuarial equivalent discount rate.  (Doc. No. 63 at 5.)  However, when interpreting Section 9.7 within the context of construing the SERP as a whole, this construction is unpersuasive.  See In re New Valley Corp., 89 F.3d 143, 150 (3d Cir. 1996) (holding that top hat plans must be interpreted as a whole).

Section 9.7 does not contain the phrase "actuarial equivalency" or even suggest the use of actuarially equivalent factors.  (See Ex. 1.)  (See also Trial Testimony Day 1 at 83:22-25; 84 at 1-2.)  Section 2.2 defines the term "Actuarial Equivalent":

> 2.2. **"Actuarial Equivalent"** means, with respect to a given benefit, any other benefit provided under the terms of the Plan which has the same present or equivalent value on the date the given benefit payment commences, based on the use of actuarial equivalent factors adopted by the Bank and being used to value the Plan liabilities at the time of the calculation.[39]

As one can see, this definition does not refer to Section 9.7.  Section 9.7 merely contains language governing the timing as to when benefits must be paid.  (See Ex. 1 at D14-D15.)  (See Section 3 supra.)  More importantly, however, the term "actuarial equivalent" appears in the following SERP provisions which are not relevant to the instant dispute:

> 4.1 **Normal Retirement Benefit**. …
>
> (c) If the Participant terminates employment after the date he attains his Normal Retirement Age, then he or she shall receive a benefit payable in equal

---

[39] This definition of actuarial equivalent includes words of limitation – "with respect to a given benefit".  Thus, it seems that actuarial equivalency does not apply to all benefits described in the SERP.  As one example, Defendant does not argue that, had the SERP continued beyond the Change of Control, actuarial equivalency would apply to the funding of the Rabbi Trust.

monthly installments commencing on the first day of the month following the Participant's retirement and continuing for the remainder of the Participant's life.  If specifically provided in the Participant's individual SERP Participation Agreement, the benefit payable shall be increased to be the **Actuarial Equivalent** of the benefit the Participant would have received had the Participant retired on the date he or she attained Normal Retirement Age.

      4.2  **Early Retirement Benefit.**  If a Participant is continually employed by the Bank until his or her Early Retirement Date, he or she shall be entitled to receive an early retirement benefit equal to the **Actuarial Equivalent** amount of his or her Accrued Benefit.  This early retirement benefit shall be payable in equal monthly installments commencing on the fast day of the month following the Participant's actual retirement, continuing for the remainder of the Participant's life.

      4.4.  **Alternate Form of Payment.**  The Bank may, in its sole and absolute discretion, approve a retiring Participant's request of an alternate form of life annuity in which case such payments shall be in the amount of the **Actuarial Equivalent** of the normal form of benefit hereunder.  No installment or lump sum payments shall be permitted under this Section 4.4.

(Ex. 1 at 8.)  None of these provisions apply to the payment of a lump sum benefit when the SERP is terminated following a Change of Control.  Akin to the SERP's drafters' use of the word "discretion" in several provisions of the SERP, the omission of the word "actuarial equivalent" in Section 9.7 suggests that they did not require or intend the use of actuarial equivalent factors in that Section.  See Luby, 944 F.2d at 1180.  If the drafters of the SERP had intended the use of the actuarial equivalent rate in Section 9.7, they would have said so, as they did in other sections of the SERP.  Rather, it appears that the purpose of Section 9.7 is to regulate the timing of the distribution of benefits, not how to calculate the payout amounts.

      **b.  BMT Board's interpretation of Section 9.7 rendered the phrase "subject to the above terms" superfluous.**

Second, as noted, Defendant contends that "subject to the above terms" in Section 9.7 only covers the terms of Section 9.7, specifically Section 9.7(a), (b), and (c).  This interpretation, however, renders the phrase "subject to the above terms" superfluous and unnecessary.

At trial, John May, an attorney and BMT Board Member, testified on cross-examination that he was aware of the canon of contract interpretation that "every term in a contract should be given meaning, and no interpretation should render language in the contract superfluous." (Trial Transcript Day 2 62:8-12.)  During this same line of questioning, Mr. May admitted that, if the phrase "subject to the above terms" were to be removed from Section 9.7, the meaning of the section would be the same.  (Id. at 62:13-16; 65:1-5.)  Mr. May agreed with Campbell's counsel that the three subsections are disjunctive, describing three alternative circumstances if the Bank decided to terminate the SERP.  (Id. at 63:6-10.)  Thus, even if the phrase "subject to the above terms" was removed from Section 9.7, the section would still permit the SERP to terminate in accordance with the three scenarios in 9.7(a), 9.7(b), or 9.7(c)[40] and the Bank would still be required to timely "distribute benefits under the Plan, to Participants, in a lump sum." (See Ex. 1.)

Hence, the BMT Board's interpretation of Section 9.7 of the SERP renders the phrase "subject to the above terms" superfluous.  The only way this phrase has any meaning is if it refers to the entirety of the SERP proceeding Section 9.7.

### c.  BMT Board's interpretation of the SERP rendered Section 6.2 meaningless.

Likewise, BMT Board's interpretation of the phrase "subject to the above terms" in Section 9.7 of the SERP would render Section 6.2 of the SERP meaningless.  As discussed, Defendant contends that Section 6.2 of the SERP only was applicable if BMT planned to continue the SERP following the merger with Royal Bank.  (Doc. No. 63 at 7 ¶ 40.)  Nevertheless, there is no language in Section 6.2 that refers to a continuation of the SERP.  (See Ex. 1 at D10-D11.)

---

[40]   Defendant asserts that it would be "illogical" to have three different discount rates apply to the three different subsections of Section 9.7.  Campbell, however, has not made this argument.

Furthermore, Section 9.7 does not identify the discount rate to be used in calculating a lump sum distribution or how to perform this lump sum calculation.  (Ex. 1 at D14-D15.)  As stated, multiple witnesses at trial testified that the phrase "lump sum" necessarily included the use of the actuarial equivalent discount rate.  (Doc. No. 63 at 5.)  But, reading the SERP as a whole in a manner that gives each portion of the plan meaning, this interpretation renders Section 6.2 meaningless.

Typically, lump sum payments, such as the ones required to be timely made under Section 9.7, need to be calculated to reflect the present value of future benefits.  (Trial Transcript Day 1 at 56:17-20.)  The equation used to make the calculation on the amount to fund the Rabbi Trust under Section 6.2 is the same equation that would be used to calculate the lump sum distributions made under Section 9.7.  (Trial Transcript Day 1 at 56:21-25; 57:1.)  Still, Section 6.2 specifies a discount rate, the 5-Year United States Treasury Note rate, while Section 9.7 specifies no discount rate.[41]  (See Ex.1.)  Thus, interpreting the phrase "subject to the above terms" to only refer to the terms of Section 9.7 does not confirm which discount rate is used to calculate the present value of future benefits.  To this point, during the first day of trial, Mr. McCutcheon, BMT's Treasurer, admitted that Section 6.2 "was the only section that had an explicit interest rate involved" in the SERP.  (Trial Transcript Day 1 232:2-10.)

So, in interpreting the language "subject to the above terms" in Section 9.7 to only refer to that section, the BMT Board ignored Section 6.2 entirely.  Section 6.2 is the only "above term" that provides any methodology for calculating the lump sum payments after a Change of Control.

[41]  In this regard, Mr. Bruschini, the SERP financial advisor, stated that, in Section 9.7(a), a discount rate "should have been stated" and "could have been stated," but "[n]ot all agreements are drafted the way we'd like them to read."  (Trial Transcript Day 1 57:7-12.)

(Ex. 1 at D10-D11.)  Simply put, if the Rabbi Trust is funded using the Citi Rate and then benefits are paid using the Citi Rate following a Change of Control, as happened in Campbell's case, Section 6.2, which states that the Rabbi Trust must be funded using the 5-Year United States Treasury Note rate following a Change of Control, would be ignored as if it was not a term of the SERP.[42]

### d. Royal Bank's prior use of the actuarial equivalent discount rate does not overcome the plain language of the SERP.

Finally, when resolving ambiguity in a contract, courts can look to the conduct of the parties.  New Valley, 89 F.3d at 150.  In this regard, Defendant asserts in support of its use of the

---

[42] Pertinent to the SERP's creation is the canon of contract interpretation contra proferentem, which is defined as "any ambiguous language in a contract is construed against the drafter and in favor of the other party if the latter's interpretation is reasonable."  Camp Ne'er Too Late, LP v. Swepi, LP, 185 F.Supp.3d 517, 550 (W.D. Pa. May 5, 2016) (quoting Colorcon, Inc. v. Lewis, 792 F.Supp.2d 786, 797 (E.D. Pa. May 31, 2011)).  When determining whether the doctrine of contra proferentem should apply to a given contract, courts look to the bargaining history of the parties and will most often apply the doctrine to contracts where there is unequal bargaining power.  In re Stuart, 402 B.R. 111, 133 (E.D. Pa. Bkrtcy. March 15, 2009) (citing Restatement (Second) of Contracts § 206 (1981)).

The parties heavily dispute whether the contract doctrine of contra proferentem applies to top hat plans like the SERP.  Defendant argues that contra proferentem should not apply, while Campbell claims that it should.  No circuit court of appeals has ruled on whether this doctrine applies to top hat plans.  Additionally, very few district courts have ruled on the issue and there is a split among those courts that have.  See Hill v. Opus Corp., 464 B.R. 361, 396 n.123 (C.D. Cal. 2011) (finding that contra proferentem is not applicable to top hat plans); see also Hoak v. NCR Corporation, 389 F.Supp.3d 1234, 1276 (N.D. Georgia 2019) (holding the doctrine of contra proferentem appliable to top hat plans); see also Hacala, 2006 WL 2241636 at *6 (applying the doctrine of contra proferentem to a top hat plan because federal common law of contract applies).

Here, the Court need not take a position on whether the doctrine of contra proferentem applies to the BMT Board's interpretation of the SERP because it does not matter whether it applies. As explained in detail above, the clear language in Section 6.2 requires the selection of the 5-Year United States Treasury Note rate in calculating SERP benefits upon a Change of Control. Thus, Campbell's interpretation of the disputed language at the end of Section 9.7 controls regardless of whether the Court applies contra proferentem.

actuarial equivalent rate that choosing the 5-Year United States Treasury Note rate would have been "an admission that Royal had engaged in securities fraud by understating its SERP liabilities on its 10ks." (Doc. No. 63 at 40 ¶ 264.) (See also Trial Transcript Day 2 at 28:2-5.) In other words, the actuarial equivalent rate – the Citi Rate - was the discount rate historically used by Royal Bank in calculating its SERP liabilities on its financial statements and any change would be improper. In response, Campbell claims that the SERP does not state that the discount rate to calculate benefits had to match the discount rate used to calculate Royal Bank's liabilities on its financial statements. (Doc. No. 64 at 17 ¶ 91.)

Defendant's contention is unavailing. As Campbell correctly points out, there is no language in the SERP that addresses whether the discount rate used to calculate a lump sum payment upon a Change of Control must match the discount rate used to calculate SERP liabilities. (See Ex. 1.) Moreover, Mr. Pearson, a SERP financial advisor, testified that while normally the same discount rate is used for determining benefits and estimating plan liabilities, it is possible that different rates can be used. (Trial Transcript Day 1 138:15-20.) Also, as discussed above, Section 9.7 does not discuss the use of actuarial equivalency, while many other sections of the SERP do.

Lastly, even though Royal Bank made a unilateral decision to put money into the Rabbi Trust using the actuarial equivalent rate to pay SERP benefits each month, there is no language in the SERP that ties the actuarial equivalent rate to the Rabbi Trust. The opposite is true for the 5-Year Treasury Note rate. Section 6.2 clearly articulates that this rate must be used following a Change of Control. In this regard, it logically follows that given the facts in this case, the more specific terms in Section 6.2 is indicative of the intent of the parties at the time of the SERP's adoption rather than the SERP's terms relied upon by Defendant.

**E.  The BMT Board abused its discretion when it selected the Citi Rate to calculate Campbell's lump sum payment.**

Notwithstanding the above analysis, the BMT Board abused its discretion when it calculated Campbell's lump sum payment using the Citi Rate rather than the 5-Year United States Treasury Note rate.  Thus, the outcome of this case would be the same even under the more deferential abuse of discretion standard outlined in Goldstein.

Under this standard, a court may overturn an administrator's decision only if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law."  Viera v. Life Ins. Co. of North America, 642 F.3d 407, 413 (3d Cir. 2011) (citing Miller v. Am. Airlines, Inc., 632 F.3d 837, 845 (3d Cir.2011) (quoting Abnathya v. Hoffmann–La Roche, Inc., 2 F.3d 40, 45 (3d Cir.1993)).  While this standard of review is deferential, "[i]t is not ... without some teeth. Deferential review is not no review, and deference need not be abject." Kuntz v. Aetna Inc., Civ. No. 10–00877, 2013 WL 2147945 at *4 (E.D. Pa. May 17, 2013) (quoting Moskalski v. Bayer Corp., Civ. No. 06–568, 2008 WL 2096892, at *4 (W.D. Pa. May 16, 2008) (quoting McDonald v. Western–Southern Life Ins. Co., 347 F.3d 161, 172 (6th Cir.2003)).

A plan administrator may have discretion when interpreting the terms of the plan; however, the interpretation may not controvert the plain language of the document.  Dewitt v. Penn-Del Directory Corp., 106 F.3d 514, 520 (3d Cir. 1995) (citing Gaines v. Amalgamated Ins. Fund, 753 F.2d 288, 289 (3d Cir. 1985)).  A court should not uphold an interpretation of a plan that is contrary to the plan language.  Id.  Additionally, "[d]iscretion must be exercised in good faith – a requirement that includes the duty to exercise the discretion reasonably."  Goldstein, 252 F.3d at 435.  In determining whether an administrator's interpretation of a plan is reasonable, courts in this Circuit consider the following factors:

(1) whether the interpretation is consistent with the goals of the Plan; (2) whether it renders any language in the Plan meaningless or internally inconsistent; (3) whether it conflicts with the substantive or procedural requirements of the ERISA statute; (4) whether the [relevant entities have] interpreted the provision at issue consistently; and (5) whether the interpretation is contrary to the clear language of the Plan.

Howley v. Mellon Financial Corp., 625 F.3d 788, 795 (3d Cir. 2010) (citing Moench v. Robertson, 62 F.3d 553, 566 (3d Cir. 1995)).

The Court will first discuss the factors related to whether the BMT Board acted reasonably in their interpretation of the SERP, and then move on to evidence of bad faith.

**1. The BMT Board's interpretation of the SERP was not consistent with goals of the SERP.**

To begin with, interpreting the SERP in a manner that gave SERP participants fewer benefits is almost certainly not one of the SERP's goals.  Therefore, this factor weighs against the reasonableness of the BMT Board's interpretation.

**2. The BMT Board rendered SERP language meaningless and internally inconsistent.**

As discussed at length, supra, the BMT Board's interpretation of the SERP rendered Section 6.2 of the SERP meaningless and the phrase "subject to the above terms" superfluous.  In all respects, the same analysis holds true here and, in this regard, the BMT Board's interpretation of the SERP was unreasonable.  Moreover, given the many instances where there is language in the SERP pointing to the BMT Board's discretion, which is absent from Section 9.7, the BMT Board's interpretation of the SERP is internally inconsistent.

**3. The BMT Board's interpretation of the SERP does not appear to conflict with the substantive requirements of ERISA, but it may conflict with the procedural requirements.**

Campbell argues that he was denied a full and fair review of his claim in violation of 29 U.S.C. § 1133, without identifying his argument as either a substantive or procedural violation.

(Doc. No. 64 at 66.)   It appears that his argument is a procedural one because a document relevant to the full and fair review of his claim was not provided to the Special Committee or the BMT Board.  The document is the Rabbi Trust Agreement.  Because this crucial document was not made available, 29 U.S.C. § 1133 may have been violated.

### 4.   The BMT Board may not have interpreted the SERP consistently.

Whether the Board interpreted the SERP consistently is difficult to discern here.  The Citi Rate was used to report SERP liabilities in tax filings and also to make lump sum payments to participants when the SERP was terminated.  This is consistent conduct.  But this practice, when viewed against the language of the SERP, raises an interpretation inconsistent with the language of the SERP.

### 5.   The BMT Board's interpretation is contrary to the clear language of the SERP.

Next, the BMT Board's use of discretion in interpreting the SERP is contrary to its clear language.   The Court has discussed at the length that Section 6.2 does not state that the section was only applicable if the SERP continued following a Change of Control.  Further, Section 9.7 makes no reference to the use of actuarial equivalence in calculating a lump sum payment.  In fact, this section does not specify any discount rate at all.  Thus, the BMT Board's interpretation of the SERP is unreasonable.

Regarding factor five (5), a Third Circuit decision, post-Firestone, supports this conclusion. In DeWitt v. Penn-Del Directory Corp., a plaintiff brought suit against her former employer to recover additional benefits under the employer's ERISA plan.  106 F.3d 514, 517 (3d. Cir. 1997). The plan in DeWitt provided that "Employer Contributions" and "Plan Forfeitures" are credited to the account of plan participants on a date referred to as the Valuation Date, which usually occurred on the first day of January.  Id.  To receive these benefits, the plan participant had to be employed

on the Valuation Date.  Id.  The specific plan provision at issue stated that "Distribution shall be made ... as soon as practicable after the end of the calendar month in which termination of employment occurs...."  Id. at 521-522.  While the plaintiff was terminated at the beginning of December, she believed she would still receive these benefits because she would not receive her distribution check until after the end of December, which would include the January 1st Valuation Date.  Id. at 517-18.  However, she received her distribution on December 28 and thus did not receive the additional benefits.  Id. at 518.

In reversing the district court's grant of summary judgment in favor of the employer, the Third Circuit concluded that, even under a deferential standard of review, the plan administrator's interpretation of the plan was unreasonable because it disregarded the express language of the plan. Id. at 521.  The court found that a "participant reading this provision could believe that it clearly prohibited distribution of an account prior to the end of the calendar month in which the employee was terminated."  Id. at 522.  Therefore, the plaintiff should not have received her distribution check until at least January 1st, which would have entitled her to the Valuation Day benefits. Id.

Here, following Royal Bank's merger with BMT, the Rabbi Trust was funded using the Citi Rate and then the lump sum benefits were subsequently paid out using the Citi Rate.  This interpretation disregarded express language of the SERP.  Section 6.2 clearly states that, if a Rabbi Trust had been established when a Change of Control occurred, it must be funded using the 5-Year United States Treasury Note rate.  Because Royal Bank had established a Rabbi Trust, it should have been funded using the 5-Year United States Treasury Note rate in an amount equal to the future value of all SERP benefits.  Therefore, the BMT Board abused its discretion when it did not do so in disregard of the express language of the SERP.

Consequently, in considering the five (5) factors to determine whether the BMT Board's interpretation of the SERP was reasonable, at least three (3), if not five (5), of the factors in Campbell's case do not favor the action of the BMT Board. In sum, the majority of the factors show that the BMT Board's decision was "without reason, unsupported by substantial evidence and erroneous under the law."

### 6. Evidence of BMT Board's Bad Faith

To the extent that the BMT Board had discretion to interpret the SERP, it was required to exercise that act subject to the duty of good faith. Goldstein, 252 F.3d at 444. While the unreasonableness of BMT Board's interpretation of the SERP is itself evidence of bad faith, the record presents other instances of bad faith.

Defendant claims the BMT Board acted in good faith because in interpreting the SERP and deciding Campbell's benefits, "no member of the BMT Board Special Committee asked for a comparative calculation of the cost of the lump sum payments using the Citi Rate as the discount rate versus the cost of the lump sum payments using the [5-Year United States Treasury Note rate] as the discount rate." (Doc. No. 64 at 42 ¶ 271.) Further, Mr. May, a BMT Board Member and member of the Special Committee, testified that no Special Committee member focused on the differences in the finances between selecting the Citi Rate versus the 5-Year United States Treasury Note rate. (Trial Transcript Day 2 at 50:4-9.)

The Court is unpersuaded by this position. The decisionmakers in this case are all highly educated, intelligent people. Mr. McCutcheon "has 44 years of work experience in banking" and Mr. May has been a transactional lawyer for 40 years. (Doc. No. 63 at 18 ¶ 123, 28 at ¶ 189.) In addition, both men and the members of the BMT Board had a duty to act in the best interest of BMT, which would include taking finances into account when making decisions on behalf of

BMT.  Both men and others on the three-member Special Committee and the BMT Board were fully aware of the financial consequences to the Bank if the 5-Year United States Treasury Note rate was used.  They also knew that Campbell, as former President of the Bank, felt that his lump sum payout of nearly $4 million was insufficient and that a considerable amount of cash was at stake.  In fact, the exact amount at stake in Campbell's request using the 5-Year United States Treasury Note rate was known to the BMT Board.  It was $368,650.47.  (Ex. 21 at D443.)

Mr. Thompson testified that he received reports from Mr. Bruschini, the SERP financial advisor, which included financial projections if the SERP continued using the 5-Year United States Treasury Note rate or if it was terminated using the Citi Rate.  (Trial Transcript Day 1 at 166:15-24.)  He further advised the BMT Board that Campbell's challenge to the discount rate used "could potentially apply to all 26 Royal SERP participants."  (Ex. 21 at D443.)  Mr. McCutcheon testified that he knew that terminating the SERP using the Citi Rate would provide less of an expense to BMT than using the 5-Year United States Treasury Note rate.  (Id. at 242:10-18.)  Mr. May testified similarly.  (Id. at 89:8-12.)  Clearly, Defendant resolved the ambiguity in Section 9.7 in a way that potentially saved BMT hundreds of thousands of dollars. The knowledge of and influence on the decisionmakers, here the BMT Board, of the financial differential depending on which rate was used is evidence of bad faith.  See Carden v. Aetna Life Ins. Co., 559 F.3d 256, 261 (4th Cir. 2009) ("When a plan administrator employs interpretative discretion to construe an ambiguous provision in favor of its financial interest, that fact may be considered as a factor weighing against the reasonableness of the decision.")

Moreover, there is evidence in the record that Campbell was denied a full and fair review of his claim.  Campbell v. Sussex Cnty. Fed. Credit Union, 602 Fed.Appx. 71, 75 (3d Cir. 2015).

While top hat plans are exempt from many ERISA requirements, participants are still required to

exhaust their administrative remedies under 29 U.S.C. § 1133.  This statute provides:

> In accordance with regulations of the Secretary, every employee benefit plan shall:
>
> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
>
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133.  The relevant regulations provide:

> (8) A document, record, or other information shall be considered "relevant" to a claimant's claim if such document, record, or other information
>
> > (i)   Was relied upon in making the benefit determination;
> >
> > (ii)  Was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination;
> >
> > (iii) Demonstrates compliance with the administrative processes and safeguards required pursuant to paragraph (b)(5) of this section in making the benefit determination; or
> >
> > (iv)  In the case of a group health plan or a plan providing disability benefits, constitutes a statement of policy or guidance with respect to the plan concerning the denied treatment option or benefit for the claimant's diagnosis, without regard to whether such advice or statement was relied upon in making the benefit determination.

29 C.F.R. § 2560.503-1(m)(8).  In accordance with these considerations of "relevancy," the Rabbi

Trust Agreement is a relevant document because it was considered at least twice in the course of

making Campbell's benefit determination.  First, as noted previously, the BMT Board's position

was that Section 6.2, which referenced the Rabbi Trust, only applied if the SERP continued.

Second, as to the 5-year United States Treasury Note rate for funding a Rabbi Trust, the Special

Committee discussed the fact that excess funds in a Rabbi Trust would be returned to BMT after all benefits had been paid in lump sums.  (See, e.g., Doc. No. 63 at 30 ¶ 197.)  Despite its crucial role here, the Rabbi Trust Agreement, which set up the Rabbi Trust, was left out of the Administrative Record.  Simply put, existence of the Rabbi Trust was integral to the interpretation of Section 6.2.

Mr. Thompson, former Royal Bank CFO, was in charge of gathering documents for both the Special Committee's and the full BMT Board's review of Mr. Campbell's claim.  Neither the Special Committee nor the BMT Board checked to ensure that Mr. Thompson had gathered all the relevant documents.  (Trial Transcript Day 1 at 185:18-20.)  Additionally, Mr. Thompson made no reference to the Rabbi Trust Agreement in his memorandum to the Special Committee reviewing Campbell's claim.  (See Ex. 18.)  The omission of this document in the package submitted for the Special Committee and BMT Board's review is further evidence of bad faith. And there is no evidence that the Special Committee members even requested a copy.  For all these reasons, the BMT Board's interpretation of the SERP was in bad faith and was unreasonable as a matter of law.  Thus, even applying Goldstein deference here, Defendant fails to sustain it's defense to Campbell's suit.

## IV.   CONCLUSION

For the foregoing reasons, judgment will be entered in favor of Plaintiff Joseph Campbell and against Defendant Royal Bank Supplemental Executive Retirement Plan in the amount of

$432,026 plus interest,[43] along with attorney's fees and costs.[44] See Fed.R.Civ.P.(d).  See also 29 U.S.C. § 1132(g)(1) ("In any action under this subchapter … by a participant, beneficiary, or fiduciary, the court in its discretion may allow … reasonable attorney's fee[s] and costs of action to either party.")  An appropriate Order follows.

---

[43]  It is well-settled that Campbell is entitled to prejudgment interest.  "In ERISA cases, 'prejudgment interest exists to make [plan participants and beneficiaries] whole and to preclude defendants from garnering unjust enrichment.'" Perez v. Koresko, 86 F.Supp.3d 293, 396 (E.D. Pa. Feb. 6, 2015) (citing Nat'l Sec. Sys., Inc. v. Iola, 700 F.3d 65, 102 (3d Cir. 2012)).  Thus, Campbell is entitled to prejudgment interest from December 18, 2017 – the date of the SERP's termination – through the date of this Opinion.  (Doc. No. 64 at 69-70.)  The exact amount of interest will be determined following a motion filed by Campbell pursuant to Federal Rule of Civil Procedure 54, after this Opinion and accompanying Order are issued. (Doc. No. 64 at 69-70.)  The parties, however, may agree on an interest rate and amount of interest without the need for a motion.

[44]  Defendant and BMT have stipulated that "if Plaintiff prevails in this action, the Plan and by extension BMT, as the funding source for the Plan, would be liable for any judgment entered in favor of Plaintiff in this action based on the Complaint that Plaintiff has filed."  (Ex. 42.)