IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOSEPH CAMPBELL,

                Plaintiff,

   v.

ROYAL BANK SUPPLEMENTAL
EXECUTIVE RETIREMENT PLAN,

               Defendant.

CIVIL ACTION
NO. 19-798

**OPINION**

**Slomsky, J.**                                             **December 20, 2022**

## I.   INTRODUCTION

On September 2, 2022, this Court entered judgment in favor of Plaintiff Joseph Campbell ("Plaintiff") in the amount of $432,026 in his action under the Employee Retirement Income Security Act of 1974 ("ERISA") against Defendant Royal Bank Supplemental Executive Retirement Plan ("Defendant"). (Doc. No. 68.) After Royal Bank, which was later acquired by Bryn Mawr Trust ("BMT"), terminated the Supplemental Executive Retirement Plan ("SERP"), Plaintiff contended that he was entitled to more than the $3,924,910 lump sum payment he received because the BMT Board of Director ("BMT Board") used an incorrect discount rate in calculating his retirement benefit. (Doc. No. 67 at 4-5.) For reasons stated in its September 2, 2022 Opinion, the Court agreed and held that the BMT Board had abused its discretion and calculated a lower discount rate in bad faith. (Id. at 49-55.) (Id. at 60.) He now seeks attorneys' fees, interest, and costs from Defendant. (Doc. No. 70.)

## II.  BACKGROUND

On September 16, 2022, Plaintiff filed the instant Motion for Attorney's Fees, Interest, and Costs pursuant to 29 U.S.C. § 1132(g), Federal Rule of Civil Procedure 54, and this Court's September 2, 2022 Judgment.  (Doc. No. 70.)  Plaintiff seeks "at least $300,922.50 in attorneys' fees, $176,181.16 in prejudgment interest, post-judgment interest pursuant to 28 U.S.C. § 1961, and costs in the amount of $4,665.29 against Defendant."  (Doc. No. 70-1 at 1.)  Plaintiff's legal team consists of Adam H. Garner, Melanie J. Garner, and several paralegals and summer associates[1] and they have spent hundreds of hours litigating this case.  (Id. at 2, 8.)

In his Motion, Plaintiff asserts that an attorney's fee award is warranted in this case because the five factors set forth in Ursic v. Bethlehem Mines, 719 F.2d 670 (3d Cir. 1983),[2] weigh in his favor.  Plaintiff further argues that the requested attorneys' fees and hours for which he seeks attorneys' fees are both fair and reasonable.  (Id. at 9-14.)  He also asserts that he is entitled to pre-judgment and post-judgment interest using a 7.33% interest rate which was the rate of return he experienced on his money in his SERP account.  (Id. at 14-16.)  Lastly, Plaintiff seeks recovery of various costs incurred during the litigation under 29 U.S.C. § 1132(g) plus tax under 28 U.S.C. § 1920.  (Id. at 16-17.)

---

[1]  Plaintiff assigns the following current market hourly rates to his legal team:  (1) Adam H. Garner at $550 per hour; (2) Melanie J. Garner at $540 per hour; and (3) paralegals and summer associates at $85 to $100 per hour "depending on the individual who performed said work and his or her role at the time the work was performed."  (Id. at 8.)

[2]  The five Ursic factors are:

> (1) the offending parties' culpability or bad faith;
> (2) the ability of the offending parties to satisfy an award of attorneys' fees;
> (3) the deterrent effect of an award of attorneys' fees against the offending parties;
> (4) the benefit conferred on members of the pension plan as a whole; and
> (5) the relative merits of the parties' position.

719 F.2d at 673 (citation omitted).

In its Response, Defendant requests that this Court stay consideration of Plaintiff's Motion pending Defendant's appeal to the Court of Appeals for the Third Circuit because a favorable disposition for Defendant might moot Plaintiff's Motion.  (Doc. No. 75 at 5.)  In addition, Defendant argues that Plaintiff should produce engagement letters with other clients for ERISA matters from June to September 2022 and that the rate of increase since being engaged is also unreasonable.  (Id. at 5-8.)  Defendant submits that a more reasonable hourly rate for Mr. Garner would be $485 per hour and for Mrs. Garner would be $395 per hour, resulting in total attorneys' fees of $256,128.  (Id. at 6-8.)  Defendant also submits that under 28 U.S.C. § 1961,[3] which governs post-judgment interest rates, the prejudgment interest rate applicable in this case is 3.47%.  (Id. at 8-11.)

In the Reply, Plaintiff opposes Defendant's request that this Court stay consideration of the Motion because "it was proper for Plaintiff to file his pending Motion after Defendant filed its Notice of Appeal" and because the Court should rule on the motion so that it may be consolidated with the pending appeal pursuant to Fed. R. Civ. P. 54(d)(2).  (Doc. No. 78 at 6.)  Additionally, Plaintiff points to the sworn declarations of other attorneys and the Community Legal Service July 2018 fee schedule to establish the reasonableness of his counsel's hourly rates.  (See id. at 7-12.)  Plaintiff further argues that the 3.47% interest rate calculated pursuant to 28 U.S.C. § 1961 would not fully compensate his losses.  (Id. at 12-14.)  Lastly, Plaintiff requests an additional $21,908 in

---

[3]  28 U.S.C. § 1961 provides:

> (a) Interest shall be allowed on any money judgment in a civil case recovered in a district court. . . .  Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[.] the date of the judgment.

28 U.S.C. § 1961(a) (alteration in original).

attorneys' fees incurred between the date of the filing of its Motion (Doc. No. 70) and the date of

the filing of its Reply (Doc. No. 78).  With these additional fees, Plaintiff seeks $322,830.50 in

attorneys' fees, $4,665.29 in costs, $176,181.16 in prejudgment interest, and post-judgment

interest pursuant to 28 U.S.C. § 1961.  (Doc. No. 78 at 14.)

  In addition, pursuant to the Order dated November 30, 2022 (Doc. No. 82), Plaintiff's

counsel gave a copy of his fee agreements with Plaintiff in this case to defense counsel.[4]  (Doc.

No. 84.)  Thereafter, Defendant filed a Supplemental Memorandum in Opposition to the Motion.

(Doc. No. 85.)  In the Memorandum, Defendant first argues that the rates in the engagement letters

---

[4]  In the January 10, 2018 letter from Mr. Garner to Plaintiff regarding their engagement agreement, Mr. Garner stated that he "will perform this work for you on an hourly basis at [his] standard rate of $400.00 per hour billed in one tenth (1/10) of an hour increments.  My paralegal, Hannah Abrahams, bills her time at the rate of $50.00 per hour, also billable in [] one tenth (1/10) of an hour increments."  (Doc. No. 84 at 7.)

On June 6, 2018, Mr. Garner sent Plaintiff a letter amending the prior engagement agreement.  (See id. at 3.)  In that letter, Mr. Garner stated that:

> Going forward, you have indicated that you would prefer that we continue to represent you on a contingent fee basis instead of at an hourly rate, and we have agreed to do so.  Thus, as of the date of this agreement and continuing onwards, if we are able to obtain any recovery for you, fees will be payable to use as set forth below.  If we are unable to obtain any recovery for you, no fee shall be owed, provided you otherwise comply with the terms of this agreement.

> If we are able to obtain any monetary recovery on your behalf (e.g., via settlement or through an appeal to the SERP plan) with respect to your claims without filing a lawsuit, you agree to pay us thirty-three and one third percent (33.3333%) of the gross amount recovered on your behalf.  In the event we agree to or are required to file a lawsuit on your behalf, our fee will be the greater of forty percent (40%) of any monetary recovery on your behalf; or the total attorney's fee awarded to you by the court or arbitrator or negotiated in a settlement.  Throughout the course of our engagement, we will track the hours we work on your behalf and will apply our standard hourly rates to that work in preparing any attorney's fee petition that we submit to a court or arbitrator on your behalf.

(Id. at 3-4.)

were for the "life of the case" and could not be increased, even by the amended fee agreement changing counsel's engagement to a contingency fee.  (Id. at 1-2.)  Next, Defendant argues that "a fee agreement is a relevant factor in selecting the hourly rate for a fee petition . . . ."  (Id. at 2-3.) In a Reply, Plaintiff asserts that the "amended engagement agreement, by its express terms, superseded the fee provisions of the original engagement agreement" and that nothing in the original agreement prohibited rate increases.  (Doc. No. 86 at 2.)  Additionally, Plaintiff argues that the cases Defendant relies upon support Plaintiff's argument that losing parties should pay a reasonable fee even if they are higher than those agreed to in a fee agreement.  (See id. at 3-4.) For reasons that follow, the Motion (Doc. No. 70-1) will be granted in part and denied in part.

## III.    DISCUSSION

Plaintiff and Defendant disagree on (1) whether this Court should rule on this Motion or stay consideration of the Motion pending the Third Circuit Court of Appeal's decision in Defendant's appeal, (2) the reasonableness of the requested hourly rates for Mr. and Ms. Garner's representation in this matter, and (3) the applicable prejudgment interest rate.  Plaintiff contends that this Court should decide the Motion because Defendant "jumped the gun" by filing its Notice of Appeal with the Third Circuit before Plaintiff filed the present Motion.  (Doc. No. 78 at 6.) Plaintiff further argues that the requested attorneys' fees are reasonable and that the interest rate representing Plaintiff's return on his SERP will wholly and adequately compensate him.  (Doc. No. 70-1 at 9-12, 14-16.)  Defendant, on the other hand, asserts that this Court should stay these proceedings because his pending appeal before the Third Circuit could result in judgment in his favor and render an award of attorneys' fees unnecessary.  (Doc. No. 75 at 5.)  Furthermore, Defendant submits that the charged hourly fees are unreasonably high in light of Plaintiff's counsel's prior representations and because "Plaintiff's counsel's dramatic 37.5% increase in

hourly rates from December 2018 ($400) to July 2022 ($550) is unreasonable on its face." (<u>Id.</u> at 5-8.)  Lastly, Defendant requests that this Court apply a lower interest rate as set forth in 28 U.S.C. § 1961.  (<u>Id.</u> at 8-11.)  Each of these issues will be addressed seriatim.

A.    **Defendant's Request That These Proceedings Be Stayed Will Be Denied**

Defendant asks this Court to stay its consideration of the present Motion because it filed in the underlying action a Notice of Appeal with the Third Circuit on September 14, 2022 (Doc. No. 69).  (<u>See</u> Doc. No. 75 at 5.)  Defendant avers that if it "prevails in its Appeal, then Plaintiff's Motion will be rendered moot, and the Court will not need to expend any time on the Motion other than to deny the Motion as moot." (<u>Id.</u>)  Defendant further submits that if it does not prevail, "then Plaintiff will have to supplement his Motion by requesting an award of attorneys' fees for the time spent on appeal - - that is, any decision by this Court before the Third Circuit rules on the appeal will not be final and instead will have to be re-visited." (<u>Id.</u>)

"As a general rule, the filing of a notice of appeal divests the district court of jurisdiction over the case pending disposition of the appeal." <u>Pensiero v. Lingle</u>, 847 F.2d 90, 97 (3d Cir. 1988) (citing <u>Griggs v. Provident Consumer Discount Co.</u>, 459 U.S. 56, 58 (1982) (per curiam)).  This rule set forth in <u>Griggs</u> is "judge-made, . . . founded on prudential considerations," and "designed to address the 'confusion and inefficiency that would result if both the district court and the court of appeals were adjudicating the same issues simultaneously.'" <u>Id.</u>; <u>United States v. Swint</u>, No. 94-276, 2007 WL 675340, at *5 (E.D. Pa. Feb. 27, 2007) (quoting <u>Venen v. Sweet</u>, 758 F.2d 117, 120 n.2 (3d Cir. 1985)).  But the <u>Griggs</u> rule "should not be employed to defeat its purpose or to induce needless paper shuffling." <u>United States v. Leppo</u>, 634 F.2d 101, 104 (3d Cir. 1980) (citing 9 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 203.11, at 3-44 n.1 (1980).  Thus, there are exceptions to the <u>Griggs</u> rule which keep intact district courts' jurisdiction over certain

6

motions notwithstanding the filing of a notice of appeal where those motions are "'uniquely separable' and collateral from the decision on the merits." Pensiero, 847 F.2d at 98. The Third Circuit has listed some of these exceptions:

> Exceptions to the rule in Griggs allow the district court to retain jurisdiction to review applications for attorney's fees, to direct the filing of supersedeas bonds, to correct clerical mistakes, and to issue orders affecting the record on appeal and the granting or vacating of bail.

Sheet Metal Workers' Int'l Ass'n Local 19 v. Herre Bros., Inc., 198 F.3d 391, 394 (3d Cir. 1999) (citing Bensalem Twp. v. Int'l Surplus Lines Ins. Co., 38 F.3d 1303, 1314 & n.9 (3d Cir. 1994)) (emphasis added). Attorney's fee awards are governed by Federal Rule of Civil Procedure 54(d)(2), which provides that:

> (A) Claim to Be by Motion. A claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages.
>
> (B) Timing and Contents of Motion. Unless a statute or a court order provides otherwise, the motion must:
> (i) be filed no later than 14 days after the entry of judgment;
> (ii) specify the judgment and the statute, rule, or other grounds entitling the movant to the award;
> (iii) state the amount sought or provide a fair estimate of it; and
> (iv) disclose, if the court so orders, the terms of any agreement about fees for the services for which the claim is made.

FED. R. CIV. P. 54(d)(2)(A)-(B).

Although the attorneys' fee award in this case is collateral, not integral, to the merits since this Court issued Judgment in Plaintiff's favor pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132 (a)(1)(B), the distinction between integral and collateral here does not matter in determining whether the district court retains its jurisdiction over the predicate matter. See Bygott v. Leaseway

<u>Transp. Corp.</u>, 637 F. Supp. 1433, 1438 (E.D. Pa. 1986).[5]  "A district court, during the pendency

of an appeal is not divested of jurisdiction to determine an application for attorney's fees."  <u>Venen</u>,

758 F.2d at 120 n.2 (citing <u>West v. Keve</u>, 721 F.2d 91, 95 n.5 (3d Cir. 1983)).[6]

     The Federal Rules of Civil Procedure and Federal Rules of Appellate Procedure also

support this interpretation.  The Committee Notes to the 1993 Amendments to Federal Rule of

Civil Procedure 54 expressly contemplates the situation before this Court:  "If an appeal on the

---

[5]  In <u>Bygott</u>, the United States District Court for the Eastern District of Pennsylvania explained why the distinction between an attorneys' fee award being integral or collateral to the merits is irrelevant in determining whether a district court may retain its jurisdiction despite a pending appeal:

> Numerous cases in this and other circuits hold that a district court retains jurisdiction to decide an attorneys' fees petition after the underlying case has been appealed. . . . <u>Venen v. Sweet</u>, 758 F.2d 117 (3d Cir. 1985); . . . <u>West v. Keve</u>, 721 F.2d 91 (3d Cir. 1983).  These cases are of two types.  The first are those cases where attorneys' fees are an integral part of the damages award.  The other type are those cases in which the attorneys' fees are collateral to the merits of the case.

> The court turns first to those cases where attorneys' fees are an integral part of damages. . . .  Those cases follow the traditional rule that an appeal is not valid where the district court's Order is not final. . . .  If the appeal is a nullity, the district court continues to have jurisdiction over the case. . . .

> On the other hand, a second line of cases considers circumstances where attorneys' fees were permitted as a recovery collateral or incidental to recovery on the main cause of action.  <u>White v. New Hampshire Dept. of Employment Security</u>, 455 U.S. 445 . . . (1982); <u>West v. Keve</u>, 721 F.2d 91 (3d Cir. 1983). . . .  In both cases, the district courts retained jurisdiction after the appeals of the cases were filed to award attorneys' fees to the parties which prevailed in district courts.

637 F. Supp. at 1438.

[6]  The Third Circuit Court of Appeals and Eastern District of Pennsylvania have held that district courts maintain jurisdiction to decide certain post-judgment motions, including motions for attoneys' fees, notwithstanding the filing of a notice of appeal to the Third Circuit.  <u>See</u> <u>Sheet Metal Workers</u>, 198 F.3d at 394; <u>Int'l Surplus</u>, 38 F.3d at 1314 & n.9; <u>Pensiero</u>, 847 F.2d at 97; <u>Worth v. Worth</u>, No. 16-3877, 2016 WL 7428201, at *2 (E.D. Pa. Dec. 22, 2016); <u>Wells v. Varner</u>, No. 03-727, 2009 WL 384568, at *6 (E.D. Pa. Feb. 17, 2009).

merits of the case is taken, the court may rule on the claim for fees, may defer its ruling on the motion, or may deny the motion without prejudice."  10 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 54App.06[2], at 12 (3d ed. 2007).  Accordingly, this Court will not stay consideration of the present Motion.

### B.    Plaintiff Is Entitled to Recover Attorneys' Fees

Under ERISA, "a court in its discretion may allow a reasonable attorney's fee and costs of action to either party."  Nat'l Sec. Sys., Inc. v. Iola, 700 F.3d 65, 103 (3d Cir. 2012) (citing 29 U.S.C. § 1132(g)(1)).  Parties seeking an attorneys' fees award must first show that they have achieved "some degree of success on the merits."  Hardt v. Reliance Standard Life Ins. Co., 560 U.S. 242, 255 (2010) (citation omitted).  Once parties satisfy this threshold showing—which is not in dispute in this case—a district court must consider the five factors set forth in Ursic v. Bethlehem Mines, 719 F.2d 670 (3d Cir. 1983).[7]  As noted above, these five factors are:

> (1) the offending parties' culpability or bad faith; (2) the ability of the offending parties to satisfy an award of attorneys' fees; (3) the deter[r]ent effect of an award of attorneys' fees; (4) the benefit conferred on members of the pension plan as a whole; and (5) the relative merits of the parties' position.

Id. at 673.  This Court is "required to consider each of the Ursic factors."  Templin v. Independence Blue Cross, 785 F.3d 861, 868 (3d Cir. 2015) (citing Anthuis v. Colt Ind. Operating Corp., 971 F.2d 999, 1011 (3d Cir. 1992) ("[O]ur requirement that district courts consider and analyze [Ursic] factors [is] a mandatory requirement.")) (alterations in original).

### 1.  First Ursic Factor:  Offending Party's Culpability or Bad Faith

Under the first Ursic factor, "[a] party is culpable if it is 'blamable; censurable [or] at fault.'"  Id. (quoting McPherson v. Employees' Pension Plan of American Re-Insurance Co. Inc.,

---

[7]  In its Response, Defendant does not object to Plaintiff's argument that this Court should grant an attorneys' fee award after consideration of the five Ursic factors.  (See Doc. No. 75.)

33 F.3d 253, 257 (3d Cir. 1994)).  First, Campbell prevailed on his ERISA claim and therefore the

SERP is the culpable party in denying liability and engaging in this litigation.  Second, this Court

explained the scope of Defendant's bad faith in its interpretation of the SERP and made other

similar findings:

> [T]he three-member Special Committee and the BMT Board were fully aware of the financial consequences to the Bank if the 5-Year United States Treasury Note rate was used. . . .
> Mr. Thompson testified that he received reports from . . . the SERP financial advisor, which included financial projections if the SERP continued using the 5-Year United States Treasury Note rate or if it was terminated using the Citi Rate. (Trial Transcript Day 1 at 166:15-24.)  [BMT Treasurer] Mr. McCutcheon testified that he knew that terminating the SERP using the Citi Rate would provide less of an expense to BMT than using the 5-Year United States Treasury Note rate. (Id. at 242:10-18.)  Mr. May testified similarly.  (Id. at 89:8-12.)  Clearly, Defendant resolved the ambiguity in Section 9.7 in a way that potentially saved BMT hundreds of thousands of dollars.
> . . .
> Mr. Thompson, former Royal Bank CFO, was in charge of gathering documents for both the Special Committee's and the full BMT Board's review of Mr. Campbell's claim.  Neither the Special Committee nor the BMT Board checked to ensure that Mr. Thompson had gathered all the relevant documents. (Trial Transcript Day 1 at 185:18-20.)  Additionally, Mr. Thompson made no reference to the Rabbi Trust Agreement in his memorandum to the Special Committee reviewing Campbell's claim.  (See Ex. 18.)  The omission of this document in the package submitted for the Special Committee and BMT Board's review is further evidence of bad faith.  And there is no evidence that the Special Committee members even requested a copy.  For all these reasons, the BMT Board's interpretation of the SERP was in bad faith and was unreasonable as a matter of law.

Campbell, 2022 WL 4009512, at *30-31.  Therefore, the first Ursic factor weighs in favor of

awarding attorneys' fees to Plaintiff.

### 2.  Second Ursic Factor:  Ability of Defendant to Satisfy an Award of Attorneys' Fees

With regard to the second Ursic factor—the ability of the offending party to satisfy an

attorneys' fee award—Defendant has sufficient assets to satisfy an award of attorneys' fees in this

case.  On January 1, 2022, BMT and its corporate parent merged with Wilmington Savings Fund

Society ("WSFS") Financial Corporation (the "WSFS-BMT Merger").  (See Doc. No. 70-3 at 4.)

Pursuant to the Agreement and Plan of Merger dated March 9, 2021, WSFS agreed to "succeed to

and assume all the rights and obligations of [BMT] in accordance with the [Pennsylvania Business

Corporation Law] and the [Delaware General Corporation Law]."  (Doc. No. 70-4 at 17.)

Delaware law provides that:

> [w]hen any merger . . . shall have become effective under this chapter, for all
> purposes of the laws of this State the separate existence of all the constituent
> corporations . . . shall cease and the constituent corporations shall become a new
> corporation, . . . being subject to all the restrictions, disabilities and duties of such
> corporations so merged.

8 Del. Code § 259(a).  Therefore, WSFS assumed all debts and responsibilities that BMT had prior

to the merger and has the ability to pay an award of attorneys' fees.  WSFS has over $20 billion in

total assets as well as net revenue of over $225 million.  (See Doc. No. 70-5 at 13-14.)

In addition, Defendant stipulated that "if Plaintiff prevails in this action, the plan and by

extension BMT, as the funding source for the Plan, would be liable for any judgment entered in

favor of Plaintiff in this action based on the Complaint that Plaintiff has filed."  Campbell, 2022

WL 4009512, at *32 n.44.  Clearly, Defendant can satisfy the requested award.  Accordingly, the

second Ursic factor weighs in favor of an attorneys' fee award.

### 3.  Third Ursic Factor:  Deterrent Effect of Attorney's Fee Award

The third Ursic factor requires courts to consider "whether it would serve the objectives of

ERISA to award counsel fees in an effort to deter conduct of the kind in which [the defendant]

engaged."  McPherson, 33 F.3d at 258.  An award of attorneys' fees in this case would have a

beneficial deterrent effect on Defendant specifically, and on others administering and managing

ERISA-compliant pension funds.  It would deter them from using the wrong interest rate in order

to pay less than is owed to those seeking lump-sum payouts.  Awarding attorneys' fees will also

deter entities from engaging in unreasonable and bad faith conduct.  Therefore, the third <u>Ursic</u> factor weighs in favor of an attorneys' fee award.

### 4.  Fourth <u>Ursic</u> Factor:  Benefit Conferred on Members of the Pension Plan as a Whole

The fourth <u>Ursic</u> factor requires that there be some "possibility of benefit to other similarly situated Plan members."  <u>McPherson</u>, 33 F.3 at 256.  This factor can be divided into two requirements:  (1) there are other similarly situated Plan members; and (2) there must be some possibility of benefit to those members.  The benefit to other Plan members cannot be indirect. <u>Estate of Schwing v. Health Plan</u>, 898 F. Supp. 2d 759, 771 (E.D. Pa. 2012).  During his direct examination by Mr. Garner, Mr. Thompson testified as follows:

> Q [Mr. Garner]:  . . .  Now, when the SERP was terminated, it wasn't just Mr. Campbell who received a – a distribution of his benefits, was it?
> A [Mr. Thompson]:  That is correct.  Every participant did.
> Q:  Okay.  And – and the discount rate that was applied to Mr. Campbell was the same for everybody else?
> A:  Yes.
> Q:  And so it was the incorrect discount rate.  It was wrong for everybody else as well, right?
> A:  That's correct.

(Doc. No. 56 at 190-91.)  Accordingly, there are other Plan members who are similarly situated to Plaintiff here.  Additionally, if the same incorrect discount rate was used for all other Plan members, then there is the possibility that those members would be entitled to a higher lump-sum payout using the proper discount rate.  Thus, the fourth <u>Ursic</u> factor is established here.

### 5.  The Fifth <u>Ursic</u> Factor:  Relative Merits of the Parties' Positions

The fifth <u>Ursic</u> factor weighs in favor an attorneys' fee award for the plaintiff if the defendant's "legal position was meritless."  <u>Templin v. Independence Blue Cross</u>, 785 F.3d 861, 868 (3d Cir. 2015).  Here, the Court entered judgment in Plaintiff's favor and rejected Defendant's arguments.  Specifically:

[T]he BMT Board's decision "without reason, unsupported by substantial evidence and erroneous under the law."

. . .

Moreover, there is evidence in the record that Campbell was denied a full and fair review of his claim.

. . .

For all these reasons, the BMT Board's interpretation of the SERP was in bad faith and was unreasonable as a matter of law. Thus, even applying <u>Goldstein</u> deference here, Defendant fails to sustain its [sic] defense to Campbell's suit.

<u>Campbell v. Royal Bank Supplemental Exec. Ret. Plan</u>, 2022 WL 4009512, at *30-31 (E.D. Pa. Sept. 2, 2022). Accordingly, Defendant's legal positions were without merit and the fifth <u>Ursic</u> factor weighs in favor of an attorneys' fee award. And since all five <u>Ursic</u> factors weigh in favor of an award for attorneys' fees, such an award will be granted.

### C.    Plaintiff's Counsel's Requested Hourly Rates and Fees Are Reasonable

#### 1.    Reasonable Hourly Rate

Plaintiff argues that the requested $550 per hour for Mr. Garner's representation and $540 per hour for Ms. Garner's representation are reasonable hourly rates.[8] To support this argument, Plaintiff has produced numerous declarations from other attorneys with substantial ERISA experience asserting that these rates are reasonable given the complexity of this case and ERISA cases in general. (<u>See</u> Doc. Nos. 70-1 at 9-13; 70-6 at 9-13; 70-8 at 5-6; 70-9 at 12; 70-10 at 6; 70-11 at 4; 70-12 at 7; 70-13 at 4; 70-14 at 6.) Plaintiff also asserts that the requested hourly rates fall below the Community Legal Services ("CLS") range for attorneys of Mr. and Ms. Garner's

---

[8] Plaintiff also requests attorneys' fees at the rates of $85 per hour or $100 per hour for work performed by paralegals and summer associates "depending on the individual who performed said work and his or her role at the time the work was performed." (Doc. No. 70 at 8.) Defendant objects only to the requested fees for Mr. and Ms. Garner. (<u>See</u> Doc. No. 75 at .) Accordingly, the Court will address only the reasonableness of the requested hourly rates for Mr. and Mrs. Garner.

years of experience when adjusted for inflation.[9]  (Doc. No. 70-1 at 9-10.)  Defendant counters that other cases decided in the Eastern District of Pennsylvania have authorized attorneys' fee awards with significantly lower hourly rates notwithstanding comparably ERISA-experienced attorneys.  (See Doc. No. 75 at 7 (citing IBEW Union No. 98 Health & Welfare Fund v. D'Nardo Electric, LLC, No. 21-1923, 2022 WL 742735, at *6 (E.D. Pa. Mar. 10, 2022); Carpenters Health & Welfare Fund of Phila. & Vicinty v. Reyes, No. 17-5107, 2018 WL 3437212, at *4 n.3 (E.D. Pa. July 16, 2018))).  Therefore, Defendant asks this Court to reduce that rate to $485 per hour for Mr. Garner and $395 per hour for Ms. Garner.

A district court uses the "lodestar" formula to determine a reasonable attorneys' fee award. See City of Burlington v. Dague, 505 U.S. 557, 562 (1992).  In Clemens v. N.Y. Cent. Mut. Fire Ins. Co., the Third Circuit Court of Appeals explained how courts apply this formula:

> Under the lodestar method, "[t]he party seeking attorney's fees has the burden to prove that its request . . . is reasonable." Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir. 1990).  "When the applicant for a fee has carried [its] burden of showing that the claimed rates and number of hours are reasonable, the resulting product is presumed to be the reasonable fee to which counsel is entitled." Maldonado v. Houstoun, 256 F.3d 181, 184 (3d Cir. 2001) (quoting Pennsylvania v. Del. Valley Citizens' Council for Clean Air, 478 U.S. 546, 564 (1986)).  But courts "have a positive and affirmative function in the fee fixing process, not merely a passive role." Id.  "In calculating the hours reasonably expended, a court should 'review the time charged, decide whether the hours set out were reasonably expended for

---

[9]  In his Motion, Plaintiff avers that the CLS range of reasonable hourly rates for attorneys with 16 to 20 years of experience is between $475 and $530 per hour.  Both the rates for Mr. Garner and Ms. Garner, attorneys with 18 years of experience, fall slightly above this range.  Plaintiff claims, however, that the $530 per hour rate at the high end of the CLS range is actually $623.11 per hour "in today's dollars" according to the Consumer Price Index published by the Bureau of Labor Statistics. (Doc. Nos. 70-1 at 9-10; 70-7 at 2.)  But several courts in the Eastern District of Pennsylvania have rejected similar arguments because, like Plaintiff here, there is "no authority that [adjusting attorneys' fees for inflation] is mandated."  Harris v. Paige, No. 08-2126, 2013 WL 4718949, at *4 n.5 (E.D. Pa. Sept. 3, 2013); see also Nitkin v. Main Line Health, No. 20-4825, 2022 WL 2651968, at *4 (E.D. Pa. July 7, 2022).  Likewise, attorneys' fees will not be adjusted for inflation here.  Instead, for reasons stated below, the requested hourly rates are reasonable notwithstanding the fact that they are slightly higher than the high end of the CLS range.

each of the particular purposes described and then exclude those that are "excessive, redundant, or otherwise unnecessary.""" Id. (quoting Pub. Interest Research Grp. Of N.J. v. Windall, 51 F.3d 1179, 1188 (3d Cir. 1995).

903 F.3d 396, 400 (3d Cir. 2018).

Here, Defendant's sole objection regarding attorneys' fees is that the claimed hourly rates are unreasonable; Defendant does not contest the reasonableness for Plaintiff's claimed hours. In Joan P.B. v. Khepera Charter Sch., the court states the relevant standards for assessing the reasonableness of a requested hourly rate for attorneys' fees:

> "The 'starting point' in determining the appropriate hourly rate is the attorneys' usual billing rate. The Supreme Court has directed that the district court should then consider the 'prevailing market rates' in the relevant community, Penn. Envtl. Def. Found. v. Canon-McMillan Sch. Dist., 152 F.3d 228, 231 (3d Cir 1998) (internal quotations and citations omitted), for attorneys of 'comparable skill, experience, and reputation,' Rode, 892 F.2d at 1183. "[A]ffidavits of non-party attorneys with personal knowledge of the hourly rates customarily charged in the relevant community" may constitute evidence of the market rate. Apple Corps. Ltd. v. Int'l Collectors Soc'y, 25 F. Supp. 2d 480, 492 (D.N.J. 1998). Additionally, "[t]he fee schedule established by Community Legal Services, Inc. (CLS) has been approvingly cited by the Third Circuit as being well developed and has been found by [the Eastern District of Pennsylvania] to be a fair reflection of the prevailing market rates in Philadelphia." Maldonado v. Houstoun, 256 F.3d 181, 187 (3d Cir. 2001) (internal quotations omitted).

420 F. Supp. 3d 347, 353 (E.D. Pa. 2019) (alteration in original). The CLS rates for attorneys with 16 to 20 years of experience is $475 to $530 per hour. (See Doc. No. 70-6 at 13.) Plaintiff's requested hourly rates of $550 and $540 per hour for Mr. and Mrs. Garner's work in this matter, respectively, exceeds this range, but represents the current market rate of their services.[10] This

---

[10] The Third Circuit requires that district courts use "the current market rate" to award attorneys' fees. Lanni v. New Jersey, 259 F.3d 146, 149 (3d Cir. 2001). "The current market rate is the rate at the time of the fee petition, not the rate at the time the services were performed." Id. The requested rates of $550 per hour and $540 per hour for Mr. and Ms. Garner, respectively, reflect those identified in Mr. Garner's Memorandum dated July 7, 2022 (Doc. No. 78-4). The Memorandum shows that, as of July 1, 2022, Mr. Garner's former rate of $525 per hour was being increased to $550 per hour, and that Ms. Garner's old rate of $515 per hour was being

Court has previously used the CLS fee schedule as a baseline to determine a reasonable hourly rate for work performed by a consumer protection attorney with substantial experience and reputation in that field.  See Alexander v. NCO Fin. Sys., 2011 WL 2415156, at *5 (E.D. Pa. June 16, 2011). Relying on affidavits from other consumer protection attorneys that the requested hourly rate was reasonable, the Court awarded an hourly rate that was twenty-one percent higher than the maximum rate in the range applicable based on the attorney's years of experience.  See id.  One reason to support this award was that the:

> CLS rate, which is a general rate that applies across all practice areas, does not take into account the opinions of [the attorney's] colleagues in the field of consumer protection litigation that the rates charged by his firm . . . are reasonable in the industry and probably even below market rate.  . . ."

Id.

Here, by comparison, Mr. and Ms. Garner's colleagues extensively discuss in their submissions the prevailing market rates for attorneys participating in ERISA litigation and all submit that the requested hourly rates are reasonable.  As in Alexander, several attorneys who have submitted affidavits here state that Mr. and Ms. Garner are seeking an hourly rate that is below the market rate.  (See Doc. Nos. 70-9 at 11; 70-11 at 4.)  Additionally, the attorneys who submitted affidavits speak highly of Mr. and Ms. Garner's reputation in ERISA litigation and describe them as "leaders of the Plaintiff's ERISA bar both locally and nationally, both of whom are regularly

---

increased to $540 per hour.  (Id.)  Therefore, the requested hourly rates accurately reflect the current market rate for Mr. and Ms. Garner's services.

As noted, Mr. and Ms. Garner's fees are slightly above the high end of the CLS range for attorneys with their level of experience and that range was last adjusted in July 2018.  In E.C. & C.O. v. Sch. Dist. of Phila., the court declined to use the CLS rates in its attorneys' fee award because, among other reasons, the 2011 rates that were in effect at the time of the court's ruling "predate[d] th[at] fee petition by nearly three years."  91 F. Supp. 3d 598, 606 (E.D. Pa. 2015). Similarly, the current July 2018 CLS rates predate the filing of the instant Motion by over four years.

sought to serve as co-counsel in complex ERISA cases." (Doc. No. 70-11 at 4.) These affidavits are compelling testimonials to the reasonableness of the Mr. and Ms. Garner's rates.

The requested hourly rates for Mr. and Ms. Garner's legal representation in this case is reasonable for several other reasons. First, "[i]t is well-recognized that 'ERISA is a complex field that involves difficult and novel legal theories and often leads to lengthy litigation.'"[11] Second, Mr. and Ms. Garner are among a limited number of attorneys who have significant experience handling ERISA matters.[12] Third, and relatedly, Mr. and Ms. Garner both are attorneys with eighteen years of litigation experience who have successfully litigated ERISA cases, including this case in which they achieved substantial success on Plaintiff's behalf.[13]

---

[11] Stevens v. SEI Invs. Co., No. 18-4205, 2020 WL 996418, at *18-4205 (E.D. Pa. Feb. 26, 2020) (citations omitted); see also Cunningham v. Wawa, Inc., No. 18-3355, 2021 WL 1626482, at *8 (E.D. Pa. Apr. 21, 2021) ("Moreover, Class Counsel's hourly rates are reasonable in light of the complexity of ERISA cases and the skill and experience of counsel."). Here, Tybe A. Brett, Esquire, submitted a declaration stating that "[t]he proposed rates reflect the specialized and complicated nature of ERISA litigation and the substantial risk that recovery may be delayed many years or that there may be no recovery at all." (Doc. No. 70-10 at 6; see also Doc. No. 70-9 at 9-10 (detailing the complexities of ERISA litigation).)

[12] (See Doc. No. 70-10 at 6 (". . . [T]here are so few attorneys with the experience and expertise necessary to represent plaintiffs in dealing with the complexities of ERISA litigation."); Doc. No. 70-9 ("There is a very limited pool of attorneys nationwide who litigate ERISA disability claims, and for that matter, ERISA welfare-benefit claims of all types."); Doc. No. 70-12 at 7 (". . . [T]here are a limited number of attorneys who handle ERISA cases and even fewer who handle complex ERISA litigation on behalf of participants. As a result of the expertise required to litigate a complex ERISA case, there is a national market for such attorneys.").)

[13] Defendant's contention that Ms. Garner is entitled to a significantly lower hourly rate because she started litigating ERISA cases only after she joined The Garner Firm in 2020 is unpersuasive given her eighteen years of "legal experience as a whole." Joan P.B., 420 F. Supp. 3d at 354 (citing Ida D. v. Rivera, No. 18-885, 2019 WL 2615481, at *8 (E.D. Pa. Sept. 26, 2019)); see also Doc. No. 70-11 at 4 ("Mr. Garner and Ms. Garner are leaders in the Plaintiff's ERISA bar both locally and nationally, both of whom are regularly sought to serve as co-counsel in complex ERISA litigation . . . . The proposed rate reflects the vast litigation experience of these two attorneys and in my opinion, the rate sought by Mr. Garner and Ms. Garner is a more than reasonable market rate, and indeed, conservative, for an attorney in the relevant community of ERISA attorneys in the Third Circuit and nationwide.").

Lastly, Defendant cites no authority suggesting that engagement letters are "the best evidence of a market rate" in seeking attorneys' fees.  (Doc. No. 75 at 5.)  This argument was rejected in M.M. v. Sch. Dist. of Phila., 142 F. Supp. 3d 396 (E.D. Pa. 2015).  There, the court stated that "counsels' hourly rates are not limited by rates specified in engagement letters; a fee agreement does not impose an automatic ceiling on an award of attorney fees." Id. at 405 (citation omitted).  And while the court recognized that "the fees stated [in engagement letters] are evidence of the prevailing rates at that time to be considered by the court," the plaintiff's "counsel have submitted sufficient affidavit evidence of the prevailing market rates for attorneys practicing in their area of expertise."[14]  Id. at 406 (citation omitted).  Thus, M.M. forecloses Defendant's argument that engagement letters are the best evidence of the prevailing market rate in light of affidavits pertaining to the prevailing market rate.  Instead, the Court relies on the several affidavits from ERISA attorneys that provide strong evidence of the reasonableness of Mr. and Ms. Garner's requested fees.[15]

---

[14] In its Supplemental Memorandum, Defendant argued that the terms of the fee agreements between Plaintiff and his counsel establish the reasonable hourly rate in this case.  True, "[t]he presence of a pre-existing fee agreement may aid in determining reasonableness.  The fee quoted to the client or the percentage of the recovery agreed to is helpful in demonstrating attorney's fee expectations when he accepted the case." Blanchard v. Bergeron, 489 U.S. 87, 93 (1993) (internal quotation marks and citations omitted).  However, in Blanchard, the Supreme Court explained the scope of considering the reasonableness of attorneys' fees:

> As we understand § 1988's provision for allowing a "reasonable attorney's fee," it contemplates reasonable compensation, in light of all of the circumstances, for the time and effort expended by the attorney for the prevailing plaintiff, no more and no less.  Should a fee agreement provide less than a reasonable fee calculated in this manner, the defendant should nevertheless be required to pay the higher amount.

Id. at 93-94.  As noted at length, the several affidavits submitted by ERISA attorneys and Mr. and Ms. Garner's legal experience support their requested hourly rate as reasonable.

[15] Notably, Defendant does not offer any counter-affidavits from other counsel challenging whether the ERISA attorneys who filed declarations in support of Plaintiff's requested rates were incorrect in their characterization of the current market rate.  Therefore, each of the

Here, the relevant benchmark for assessing the reasonableness of an hourly billing rate is the current market rate. Because Plaintiff produced the July 7, 2022 Memorandum detailing the new hourly billing rates that became effective prior to the filing of the present Motion and because other ERISA attorneys filed declarations stating their belief that the requested fees are reasonable, Mr. and Ms. Garner's requested hourly rates represent the current market rate and are therefore reasonable. Therefore, the lodestar in this case is the $322,830.50, which includes Plaintiff's most recent request for attorneys' fees in preparing its Reply (Doc. No. 78).

Determining the lodestar does not end the Court's inquiry; the Court may adjust that amount upward or downward after taking into account other considerations. See Hensley v. Eckerhart, 461 U.S. 424, 434 (1983). Such considerations are the twelve factors listed in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974).[16] Id. at 434 n.9. The

---

declarations filed in support of Plaintiff's Motion are uncontradicted and this Court may give them due consideration. See, e.g., Washington v. Phila. Cnty. Ct. of Common Pleas, 89 F.3d 1031, 1036 (3d Cir. 1996) ("[D]istrict court is not free to disregard [an] attorney's affidavit when the other party 'filed no affidavit and offered no testimony contesting the accuracy of [the attorney's] statement with respect to charges by comparable practitioners.'") (quoting Black Grievance Comm. v. Phila. Elec. Co., 802 F.2d 648, 652 (3d Cir. 1986)).

[16] The Johnson factors are:

(1) The time and labor required;
(2) The novelty and difficulty of the questions;
(3) The skill requisite to perform the legal service properly;
(4) The preclusion of other employment by the attorney due to acceptance of the case;
(5) The customary fee;
(6) Whether the fee is fixed or contingent;
(7) Time limitations imposed by the client or the circumstances;
(8) The amount involved and the results obtained;
(9) The experience, reputation, and ability of the attorneys;
(10) The "undesirability" of the case;
(11) The nature and length of the professional relationship with the client; and
(12) Awards in similar cases.

488 F.2d at 717-19.

Supreme Court has "recognized that 'in some cases of exceptional success an enhanced award may be justified.'" Blum v. Stenson, 465 U.S. 886, 897 (1984) (quoting Hensley, 461 U.S. at 434). However, such upward adjustments are not justified where the prevailing party's affidavits "do not claim, or even mention, entitlement to a bonus or upward revision." Id. at 898. Here, the Garners do not mention entitlement to an upward revision of attorneys' fees. Additionally, none of the Johnson factors support decreasing the requested attorneys' fee award in this case.

Furthermore, Plaintiff's requested $21,908 in fees for 41.1 hours spent by Mr. and Ms. Garner in drafting, finalizing, and filing his Reply is reasonable.[17] Plaintiff's petition required researching a complex area of law and gathering declarations from other ERISA attorneys licensed to practice in various jurisdictions, including the Eastern District of Pennsylvania, to determine the reasonableness of his requested attorneys' fee award. Defendant also has not filed any objections to Plaintiff's time spent preparing the present Motion (Doc. No. 70). In addition, Defendant has not objected to the $4,665.29 in costs requested by Plaintiff for various filing fees. Therefore, Plaintiff will be awarded $322,830.50 in attorneys' fees and $4,665.29 in costs.

### 2.    Number of Hours Reasonably Expended on the Litigation

When awarding fees, a district court must "decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are 'excessive, redundant, or otherwise unnecessary.'" Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 426 F.3d 694, 710 (3d Cir. 2005) (quoting Pub. Interest Research Grp. v. Windall, 51 F.3d 1179,

---

[17] "[L]egal services rendered in a dispute over the attorneys' fees due a prevailing plaintiff are recoverable under a fee shifting statute." Pub. Interest Research Grp. v. Windall, 51 F.3d 1179, 1190 (3d Cir. 1995) (citations omitted). Courts considering the reasonableness of requested attorneys' fees for services performed in relation to determining appropriate attorneys' fees "should consider whether these services require the same quality of expertise and skill as the underlying dispute." Id.

1188 (3d Cir. 1995)).  In response to the specific objections made by a party opposing the award of fees and costs, a court must conduct a "thorough and searching analysis" to identify charges that should be excluded.  See id. (quoting Evans v. Port Auth. of N.Y. & N.J., 273 F.3d 346, 362 (3d Cir. 2001)).  The Court "may not reduce an award sua sponte; rather it can only do so in response to specific objections made by the opposing party."  Id. at 711.

However, a district court has an affirmative role in ensuring that a request for fees is "accompanied by 'fairly definite information as to hours devoted to various general activities.'" UAW Local 259 Soc. Sec'y Dept. v. Metro Auto Ctr., 501 F.3d 283, 291 (3d Cir. 2007) (quoting Evans, 273 F.3d at 361).  Therefore, "[w]here the documentation of hours is inadequate, the district court may reduce the award accordingly."  Id. (quoting Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)).  The Third Circuit has emphasized that a district court must "'go line, by line, by line' through the billing records supporting the fee request."  Interfaith, 426 F.3d at 713 (quoting Evans, 273 F.3d at 362).

Upon inspection of the timesheets attached to the Motion (Doc. No. 70-6), the information on the various activities by counsel support the time spent and the reasonableness of the fee.  But there are a few exceptions.  The 6/24/2019 entry for "[c]onfer[ring] with client regarding [redacted]" by Mr. Garner, he seeks compensation for 1.3 hours more than he worked on the matter indicated.  (Id. at 19.)  As such, his fee will be reduced by $715.  An 11/11/2019 entry seeks compensation for 0.2 hours more than Mr. Garner worked for researching Rabbi Trust issues, resulting in a $110 fee reduction.  (Id.)  The 12/12/2019 billing entry for "Confer[ring] with process server regarding service of subpoena" entered by Mr. Garner shows that only 0.4 hours were worked, but he seeks compensation for 2.4 hours of work.  (See id. at 20.)  This was clearly a clerical error which results in a fee reduction of $1,100.  On 12/18/2019, Mr. Garner sought

compensation for 0.5 hours more than he worked for preparing and conducting Michael Thompson's deposition and traveling to Defendant's counsel's office and back, resulting in a disallowance of $275. (<u>Id.</u>) Therefore, the Court will exclude 4 hours of Mr. Garner's work from the calculation for attorney's fees. Plaintiff's attorneys' fee award therefore will be reduced by $2,200.

### 3.    Final Calculation of Fee Award

Accordingly, the Court will exclude a total of 4 hours from the calculation for attorneys' fees. These hours represent errors between hours worked and hours for which Plaintiff's attorneys sought compensation. As a result, Plaintiff's attorneys' fee award will be reduced by $2,200. Therefore, the Garners are entitled to receive attorneys' fees in the amount of $320,630.50, including the time expended by their paralegal and summer associate, and costs in the amount of $4,665.29.

### C.    Plaintiff Will Be Awarded a Prejudgment Interest Rate of 3.47%

"Section 502(a)(3) authorizes a court to award prejudgment interest as a form of appropriate equitable relief." <u>Nat'l Sec. Sys., Inc. v. Iola</u>, 700 F.3d 65, 102 (3d Cir. 2012). In the ERISA context, "prejudgment interest exists to make [plan participants and beneficiaries] whole and to preclude defendants from garnering unjust enrichment." <u>Id.</u> The Third Circuit has left the decision to award prejudgment interest in the district court's discretion. <u>Skretvedt v. E.I. Dupoont de Nemours</u>, 372 F.3d 193, 207 n.20 (3d Cir. 2004) (citing <u>Anthuis v. Colt Indus. Operating Corp.</u>, 971 F.2d 999, 1010 (3d Cir. 1992)). But "[a]s a general rule, prejudgment interest is to be awarded when the amount of the underlying liability is reasonably capable of ascertainment and the relief granted would otherwise fall short of making the claimant whole because he or she has been denied the use of the money which was legally due." <u>Del. River & Bay Auth. V. Kopacz</u>, 584 F.3d 622,

634 (3d Cir. 2009) (quoting Skretvedt, 372 F.3d at 208) (citation omitted).  As the Court noted in its September 2, 2022 Opinion, "[i]t is well-settled that Campbell is entitled to prejudgment interest."  Campbell v. Royal Bank Supplemental Exec. Ret. Plan, 2022 WL 4009512, at *32 n.43 (E.D. Pa. Sept. 2, 2022).  The parties agree that the applicable interest rate set forth in 28 U.S.C. § 1961 is 3.47% as of the date of judgment.

In Russo v. Abington Mem. Hosp. Healthcare Plan, the court applied the interest rate set forth in 28 U.S.C. § 1961, as "most analogous" to "determining the appropriate ERISA pre-judgment interest rate."  257 F. Supp. 2d 784, 787 (E.D. Pa. 2003) (quoting Holmes v. Pension Plan of Bethlehem, No. 98-1241, 1999 WL 179794, at *3 (E.D. Pa. Mar. 24, 1999)); see also Nat'l Sec. Sys. v. Iola, 700 F.3d 65, 102-03 (3d Cir. 2012) (affirming district court's application of § 1961's post-judgment interest rate to prejudgment interest); Brown v. Cont'l Cas. Co., No. 99-6124, 2005 WL 1949610, at *5 (E.D. Pa. Aug. 11, 2005) ("[In Russo], this court determined that the proper interest rate to apply [for prejudgment interest] was the statutory rate for post-judgment interest set forth in 28 U.S.C. § 1961.") (citing Russo, 257 F. Supp. 2d at 787).  The Russo court held that the interest rate set forth in § 1961 met the dual goals of prejudgment interest awards in ERISA cases:  (1) making the beneficiary whole; and (2) avoiding a defendant's unjust enrichment.

Balancing these goals here, the Court first considers the goal of making the beneficiary whole.  See Iola, 700 F.3d at 102-03 (affirming district court's prejudgment interest decision where it "thoughtfully weighed the interests in making the plaintiffs whole and in avoiding [defendant's] unjust enrichment"); Holmes, 213 F.3d at 132 (upholding district court's imposition of prejudgment interest at rate set forth in § 1961 where it balanced the equities and concluded that "restitution [using the § 1961 rate] was the most equitable measure of interest due").  Here, it would be inappropriate to award an interest rate that is speculative on the Court's part and the

23

result of market volatility when there is a reliable and easily calculable interest rate that other

courts have applied in the prejudgment interest rate context.  See Holmes, 213 F.3d at 132.[18]

      Plaintiff cites Dwyer v. Unum Life Ins. Co. of Am. to support his contention that the post-

judgment interest rate set forth in § 1961 is inappropriate.  548 F. Supp. 3d 468 (E.D. Pa. 2021).

In Dwyer, however, while the court declined to use the § 1961 rate, that rate was then

"approximately .08%," which it found was "insufficient to serve the purpose of prejudgment

---

[18] In Holmes, the Third Circuit affirmed the district court's application of the interest rate set forth
in § 1961.  213 F.3d at 134.  The district court applied the § 1961 rate instead of "the actual rate
of return that the Pension Plan earned during the period it wrongfully delayed payment of
[Appellants'] benefits."  Id. at 131.

Focusing on the first goal of prejudgment awards in ERISA cases—making the plan
beneficiaries whole—the district court "concluded that it would be inappropriate to award
interest at a rate higher than the essentially zero-risk yield on Treasury Bills provided for in  28
U.S.C. § 1961."  Id. at 132.  It stated that the actual return rate was inappropriate because "it
would be 'highly speculative' to simply assume that Appellants would have invested their
benefits in higher-risk, higher-yield securities, and that to so assume would be to reward them
for risks they did not take."  Id.

The district court also concluded that "disgorgement of the defendant's actual profits would be
the appropriate measure of interest to be awarded" if the second goal of ERISA prejudgment
interest—preventing unjust enrichment—was the only goal.  Id.  Accordingly, after balancing
ERISA's twin goals, the district court concluded that the statutory rate set forth in § 1961 "was
the most equitable measure of interest due."  Id.

On appeal, the Third Circuit held that there was no abuse of discretion and added that:

> [A]ny return the Plan realized in excess of the risk-free yield on Treasury Bills
> during the relevant period would be the result of the Plan's investment expertise
> and labor, as well as additional risk that the Plan, not Appellants, bore.  Had the
> Plan's investments yielded a lower rate of return than Treasury Bills, or even a loss,
> it would have been the Plan rather than Appellants that would have been required
> to bear the resulting loss.

Id.  The Third Circuit further held that "[a]warding Appellants in this case interest at a higher
rate then [sic] they would have earned had they invested their benefits on their own behalf would
go beyond making them whole.  Therefore, ERISA's goals can be achieved by awarding interest
below the rate actually earned by the Plan."  Id. at 134.

interest in making Plaintiff whole and preventing unjust enrichment." <u>Id.</u> at 497-98.  Furthermore, although Plaintiff argues that either the 6% default interest rate set under Pennsylvania law or the federal prime rate of 6.25% should apply, the court in <u>Dwyer</u> applied a rate almost identical to that currently set forth under § 1961—3.85%.[19] <u>Id.</u> at 498.

Because a 3.47% interest rate is sufficient to prevent Defendant and other similarly-situated ERISA plan administrators from garnering unjust enrichment by withholding funds participants are entitled to receive and to make Plaintiff whole here, it meets ERISA's prejudgment interest goals.  Defendant therefore will be ordered to pay Plaintiff the full amount he is entitled to receive under the SERP as well as pre- and post-judgment interest and attorneys' fees and costs. Accordingly, Plaintiff is entitled to 3.47% in prejudgment interest on the $432,026 awarded Plaintiff from December 28, 2017 through September 2, 2022.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Attorneys' Fees, Interest and Costs (Doc. No. 70) will be granted in part and denied in part.  Plaintiff will be awarded $320,630.50 in attorneys' fees, $4,665.29 in costs, prejudgment interest at a rate of 3.47%, and post-judgment

---

[19] In <u>Dwyer</u>, the court expressly rejected the plaintiff's suggestion to apply the 6% default interest rate under Pennsylvania law because that "rate of interest lacks a sufficient nexus to current economic conditions to be reasonable." <u>Id.</u> at 498.  Rather, the court combined the two prime interest rates in effect while the plaintiff was deprived of the use of his funds to reach a final rate of 3.85%, which is just .38% higher than that currently set forth in § 1961. <u>Id.</u>

Plaintiff further argues that this Court should not use the § 1961 rate because the consumer price index has exceeded this rate and the 3.47% interest rate would result in a negative return for him. The Court disagrees.  Given the outcome of this litigation, which culminated in a judgment in Plaintiff's favor, the § 1961 rate is a much fairer prejudgment interest rate. <u>See Holmes</u>, 213 F.3d at 133 ("Interest earned in excess of what Appellants themselves would have earned is not earned at [the beneficiaries'] expense[—one of ERISA's two primary focuses]."  Other courts have rejected similar arguments to adjust attorneys' fee awards for inflation. <u>See supra</u> n.8.

interest pursuant to 28 U.S.C. § 1961.  Plaintiff will not be awarded prejudgment interest at a rate

of 7.33%.  An appropriate Order follows.